Marc E. Kasowitz (mkasowitz@kasowitz.com)
David J. Shapiro (dshapiro@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for Plaintiffs Peter M.
Jarowey II and Somerset Group, LLC

Joseph D. Carney (jdc@jdcarney.com)

JOSEPH D. CARNEY &
  ASSOCIATES, L.L.C.
2001 Crocker Road, Suite 530
Westlake, Ohio  44145
(440) 249-0850

Attorneys for Plaintiffs John
B. Hollister III and Douglas Q. Holmes



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

PETER M. JAROWEY II, SOMERSET GROUP, LLC, :
JOHN B. HOLLISTER III, and DOUGLAS Q. HOLMES, :
  :
Peter M. Jarowey II, John B. Hollister III and Douglas Q. :
Holmes Individually and Peter M. Jarowey II Derivatively :
on Behalf of Camelot Entertainment Group, Inc., for the :
Second and Third Claims for Relief, :
  :
          Plaintiffs, :
  :
   -against- :
  :
  :
CAMELOT ENTERTAINMENT GROUP, INC., :
ROBERT P. ATWELL and STEVEN V. ISTOCK, :
  :
       Defendants. :

------------------------------------------------------------------- x

Civil Action No. _____

**COMPLAINT**

Jury Trial Demanded

     Plaintiffs Peter M. Jarowey II ("Jarowey"), Somerset Group, LLC ("Somerset"), John B.

Hollister III ("Hollister"), and Douglas Q. Holmes ("Holmes") (collectively, the "Plaintiffs"), by

and through their undersigned counsel, for their Complaint against Defendants Camelot

Entertainment Group, Inc. ("Camelot" or the "Company"), Robert P. Atwell ("Atwell") and

Steven V. Istock ("Istock"), allege on personal knowledge as to themselves and on information

and belief as to all other persons, as follows:

## SUMMARY OF THE ACTION

1.     This action seeks redress for violations of federal and state securities laws,

the fraudulent and tortious conduct of officers and directors of a public company, corporate

waste, and breach of contract.  Claims asserted herein arise under and are pursuant to, among

others, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5.

## Rule 10b-5 Violations

2.     In May 2010, Camelot, an entertainment company, entered into an

employment contract with Jarowey, a business consultant (the "Contract").  Plaintiffs Hollister

and Holmes are third-party beneficiaries of the Contract.  Pursuant to the terms of the Contract,

Camelot promised to pay Jarowey for his labors with stock in the Company that had been issued

pursuant to U.S. Securities and Exchange Commission ("SEC") Form S-8 ("S-8 Shares") if it did

not have the funds to pay him in cash.  S-8 Shares are, with limited exceptions, non-restricted

and can be traded immediately upon issuance.  There is no waiting period as with, for example,

non-registered shares issued pursuant to Securities Act Exemption from Registration Section

4(2) or SEC Rule 506, which are then typically sold pursuant to SEC Rule 144 ("Rule 144

Shares").  S-8 Shares are, therefore, more valuable than Rule 144 Shares, and Jarowey would not

have entered into the Contract absent the Company's promise that he would be paid in S-8

Shares if he could not be paid in cash.

3.     Pursuant to the terms of the Contract, therefore, Jarowey purchased with

his labor Camelot common shares registered on Form S-8.  However, at the time of contracting,

Camelot had no intention of fulfilling its promise to pay Jarowey in S-8 Shares should it not have

the cash to do so.  When it executed the contract, Camelot had promised S-8 Shares to too many

of its other professionals and consultants in order to induce them to provide services, and it knew at that time that it would not have enough S-8 Shares with which to compensate Jarowey. Camelot has had minimal earnings over its lifetime and it could not compensate its professionals in cash. Camelot also determined to use its ability, whether or not in breach of contract, to choose to whom it would issue S-8 Shares as a means of favoring certain consultants and disadvantaging others.

4.      To this day, nearly a year after contracting to do so, Camelot has never paid Jarowey any S-8 Shares for his labors as required by the Contract despite the fact that it has registered and issued billions of S-8 Shares to others. By misrepresenting its intention to pay Jarowey with S-8 Shares at the time of contracting, Camelot violated Rule 10b-5 (and its state analogue) because it used the means of interstate conduct to engage in a course of business which operated as a fraud upon Jarowey in connection with his purchase of Camelot stock, as the statements in the Contract were false and misleading when made and remain false and misleading today  The statements were made with scienter, were relied upon by Jarowey, and the violations caused damages.

## Breach of Fiduciary Duty and Corporate Waste

5.      There are only two members on Camelot's Board of Directors (the "Board"): the individual defendants Atwell (President, Chairman and Chief Executive Officer), and Istock (Chief Financial Officer). (A third individual was elected to the Board in December 2010, but he is at present only a "Special Consultant" to the Board until the Company procures director and officer liability insurance and he is not a defendant in this action.)

6.    Atwell and Istock breached their fiduciary duties to Camelot and Jarowey, who is a shareholder in the Company. Camelot had the opportunity to purchase a number of entertainment-related companies in 2009-10. The acquisitions were in the Company's best interests. The acquisitions would have generated significant revenues and earnings for the Company for the first time in its history, and the acquisitions would have vastly increased the value of the Company and the value of the Company's common shares.

7.    Atwell and Istock, however, after initially seeking the acquisitions, developed an adverse interest to the acquisitions. Stated differently, Atwell and Istock developed an interest in making sure that the acquisitions were not consummated. The consummation of the acquisitions would have resulted in, among other things: (i) a dramatic reduction in Atwell and Istock's power to control the Company; (ii) the loss of lavish executive compensation packages (only Atwell and Istock are on the Company's Compensation Committee); and (iii) restrictions on the amount of money that could be "upstreamed" from the acquired companies (which would have become divisions in a new, vertically integrated corporation). By refusing to close on the acquisitions, Atwell and Istock put their own personal interests for control over the Company and an unfettered access to salary and stock over the best interests of the Company. These actions constitute a breached their fiduciary duties.

8.    Atwell also breached his fiduciary duties by directing Camelot to execute an extraordinarily lucrative, extravagant and wasteful employment agreement whose benefits to him vastly outweighed any benefit he was bringing to the Company as demonstrated by, among other things, the Company's poor performance.

9.      On April 26, 2010, Atwell instructed Camelot to execute an employment agreement with him (the "Atwell Employment Agreement"). By April 2010, Atwell had been President, Chairman and CEO of Camelot for seven (7) years. He owned over 80% of the Company's preferred stock. He was entitled to cast 69% of the votes in any vote by the Company's stockholders. He was only one of two individuals on the Compensation Committee. He had paid himself a salary of $250,000 and stock for years while the Company barely made any money. He supported a lavish lifestyle by selling notes in the Company. But, by April 2010, Atwell had a problem. He knew that, pursuant to an upcoming substantial preferred stock issuance to a large private equity firm, he would soon have to answer to this new major shareholder. Therefore, before anyone could ask any serious questions, he instructed Camelot to execute the Atwell Employment Agreement.

10.     The Atwell Employment Agreement is an egregious example of self-dealing and corporate waste. Pursuant to the terms of the Atwell Employment Agreement, Atwell receives from Camelot, among other things:

- A seven (7) year term of employment;

- An annual Base Salary of a minimum of $500,000 in either cash or common or preferred stock;

- A Signing Bonus of $500,000;

- Deferred Compensation equal to 120% of the Base Salary for each year the Deferred Compensation is earned;

- An automatic grant of restricted stock units having a value of $10 million;

- A salary of $4 million per year for five (5) years if he becomes an "Advisor/Producer" for the Company;

- A minimum Annual Bonus of $250,000;

- An Additional Annual Bonus of $1,000,000;

- An Automobile Allowance of $48,000 per year;

- A Housing Allowance of $120,000 per year;

- A Wardrobe Allowance of $10,000 per month; and,

- A Screening and Equipment Allowance of $700,000.

The Atwell Employment Agreement is worth approximately $50 million over a seven (7) year period, which is roughly five (5) times the value of the Company and $50 million more than the Company's Net Revenues from 2009 and 2009 (which were zero).

11.    The Atwell Employment Agreement also gives Atwell total control of the Company, *forever*. There can be no Chairman of the Board other than Atwell, and if (as majority shareholder) he elects himself as Chairman, he "shall serve as Chairman of the Board *in perpetuity*." It provides that no officer, director, employee, agent or consultant can have a title, position, authority and/or compensation package that is superior to that of Atwell's. And the agreement gives Atwell "full business and creative control within the Company."

12.    Atwell was acting as a Director and a member of the Compensation Committee when he instructed the Company to execute the agreement with himself. Atwell, therefore, was not disinterested or independent at the time the decision was made. The Atwell Employment Contract is an egregious example of extravagant self-dealing and corporate waste. It is also, therefore, a breach of Atwell's fiduciary duty to Camelot, its shareholders and its creditors.

### Breach of Contract

13.    Camelot also breached the Contract. It never paid Jarowey his compensation in either S-8 Shares or in cash. He is owed money or S-8 Shares for expenses.

Jarowey is owed Bonus Shares.  Camelot has also failed to honor its contractual obligations to Hollister and Holmes.  Pursuant to the Contract, Hollister and Holmes should have been issued $100,000 each, for a total amount of $200,000 collectively, in the Corporation's Class G Convertible Preferred Stock as compensation for their services.  That never happened.

## THE PARTIES

Peter M. Jarowey II

14.     Jarowey is a business consultant.  He provides a number of services to corporations including, but not limited to, business development.  Jarowey resides at 214 Windsor Road, Waban, Massachusetts 02468.  Prior to starting his consulting company Somerset (described below), Jarowey was a senior executive in Fortune 500 public companies, privately-owned manufacturing firms, private-equity partnerships, start-ups and the U.S. Government.

Somerset Group, LLC

15.     Somerset is a Virginia limited liability company with a business address at 214 Windsor Road, Waban, Massachusetts 02468.  Jarowey is the President of Somerset and through Somerset provides consulting services.

John B. Hollister III

16.     Hollister is an investment banker.  He provides investment banking and corporate advisory services.  He resides at 15775 North Ridge Drive, Novelty, Ohio 44072.

Douglas Q. Holmes

17.     Holmes is also an investment banker who provides investment banking and corporate advisory services.  He resides at 1111 Superior Ave E Suite 1400 Cleveland, Ohio 44114.

Camelot Entertainment Group, Inc.

18.     Camelot is a Delaware corporation.  It is in the business of developing, producing, marketing and distributing film, television, and digital media products.  Its shares are publicly traded on the Over-the-Counter Bulletin Board ("OTCBB") under the stock symbol "CMGR."  The Company's principle place of business is 8001 Irvine Center Drive, Suite 400, Irvine, California 92618.

19.     Camelot also, among other things, sells, distributes and licenses media products, including DVDs and films, through its subsidiaries Camelot Distribution Group, Inc. ("CDG") and DarKnight Pictures.  The Company began generating revenues through its distribution operations in 2010 and its distribution operations are transacted in, among other places, New York City.  For example, on May 27, 2010, CDG licensed to A&E Television Networks, LLC ("AETN"), whose principle place of business is 235 East 45th Street, New York, NY 10017, the program "The Elm Street Legacy" for exhibition over the AETN networks for a period of twenty-five (25) years for a licensing fee of $300,000.  The Company regularly conducts business in New York in connection with its sale and distribution of DVDs, and for other purposes.

20.     On June 1, 2010, the Camelot Board approved a 20,000 to 1 reverse stock split which became effective on June 30, 2010.  This lowered the number of the Company's common shares.  Since the reverse stock split, the number of outstanding shares of the Company's common stock has risen from 846,316 on June 30, 2010, to over 16 billion today. Previously, as of September 13, 2010, Camelot had issued 56.6 million shares of common stock to 163 shareholders and approximately 51 million shares of preferred stock (in different classes) to twenty-two shareholders.

8

21.    As of September 30, 2010, the Company had a total of twelve employees and approximately nine consultants who provided services on an as-needed basis. The Company also retains independent contractors on a project-by-project basis.

22.    The Company's Common Stock was subject to a "chill" placed on deposits into Cede & Co. by The Depository Trust and Clearing Corporation on October 12, 2009. This "chill" affected the ability of stockholders to deposit new shares into the market through Cede & Co. and it affected investors' ability to purchase or sell Camelot stock. The "chill" was put in place to review the high volume of shares issued during the second quarter of 2009. The "chill" was lifted on April 12, 2010.

23.    Camelot's common stock was deleted from the OTCBB effective February 23, 2011, on account of its failure to comply with SEC Rule 15c2-11 ("Initiation or Resumption of Quotations Without Specified Information"). It is not known why the Company failed to file its information to retain its status such that its common stock could trade on the OTCBB.

Robert P. Atwell

24.    Atwell is the Chairman, President and Chief Executive Officer of Camelot. Atwell is responsible for, among other things, making acquisition decisions, retaining consultants, and drafting and approving contracts with those consultants. Atwell started Camelot Films in 1977. Atwell is only one of two members of Camelot's Board, as was the case during the period of events set forth in this Complaint. From 1977 until today, Atwell has controlled the day-to-day operations of the Company and has made all major decisions regarding the Company's business and financial plans.

9

25.     As of March 8, 2010, Atwell represented that he had total assets of approximately $11.3 million, total liabilities of approximately $2.9 million, and a total net worth of approximately $8.4 million.

Steven V. Istock

26.     Istock joined Camelot as Chief Financial Officer and as a member of the Company's Board on July 1, 2010.  He was re-elected to the Board on December 13, 2010 for a five (5) year term.  Istock is only one of two members of the Board and the Company's Compensation Committee.  As CFO, Director, and a member of the Compensation Committee, Istock is involved in decisions regarding, among other things, acquisitions by Camelot and the Company's executive compensation policies.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b)(3).

## FACTS

I.      **CAMELOT VIOLATED RULE 10B-5 BY PROMISING TO PAY JAROWEY IN S-8 STOCK WHEN IT HAD NO INTENTION OF DOING SO, AND IT BREACHED HIS CONSULTING AGREEMENT BY, AMONG OTHER THINGS, FAILING TO PAY HIM IN THAT S-8 STOCK.**

29.     Between August 2009 and May 2010, Camelot entered into a number of consulting agreements with Jarowey, Somerset, Holmes and Hollister.  (Jarowey, Hollister and

Holmes are referred to herein as the "Consultants.")  Camelot violated Rule 10b-5 by representing, at the time of entering into the contracts, that it would issue Jarowey S-8 Shares when it had no intention of doing so.  Camelot also breached those agreements by, among other things, failing to issue S-8 Shares as compensation for work performed by Jarowey and Class G Preferred Shares (of a certain value) for work performed by Holmes and Hollister.  The facts are as follows:

### A.    The August 11, 2009 Financial Advisor Agreement.

30.    Jarowey began providing consulting services to Camelot on or about July 1, 2009.  On August 11, Somerset and Camelot entered into a Financial Advisor Agreement (the "FAA").  The FAA was negotiated and co-drafted by Jarowey and Atwell.

31.    Pursuant to the terms of the FAA, Somerset agreed to act as a financial advisor to Camelot in connection with placing mezzanine debt and/or senior debt and the Company's proposed acquisition of several film companies.  Camelot agreed that Somerset would receive the assistance of Hollister and Holmes in Jarowey's advisory and placement efforts, and that Camelot would compensate Hollister and Holmes for their efforts.  The term of the FAA was one year with an option to extend.

32.    Pursuant to the terms of the FAA, as compensation for services provided by Somerset and Hollister and Holmes, Camelot agreed to pay a nonrefundable cash "Advisory Fee" in the amount of four hundred thousand dollars ($400,000), payable upon the closing of the financing and/or the acquisitions.  The Advisory Fee was to be paid as follows:  (i) Two Hundred Thousand Dollars ($200,000.00) to Somerset, and (ii) One Hundred Thousand Dollars ($100,000.00) each to Holmes and Hollister.  Pursuant to the terms of the FAA, Somerset,

Holmes and Hollister were given the option of receiving Camelot "Registered Common Stock" or "Common Stock Warrants" in lieu of cash for the Advisory Fee payment. The FAA stipulated that the value for the Common Stock would be calculated at the thirty (30) day average bid price for the period of thirty (30) days prior to July 31, 2009.

33.    The FAA set forth Camelot's financial obligations in case the financing or the acquisitions were not completed within the term of the agreement. In such a scenario, Camelot's obligation to pay the Advisory Fee would continue with respect to any financing concluded by the Company for one year following the agreement's expiration with any party that Somerset, Hollister or Holmes had introduced to the Company, or any party with whom Somerset, Hollister or Holmes had participated in material discussions concerning the financing and/or the acquisitions. Camelot also agreed to reimburse Somerset's expenses regardless of whether or not the financing or acquisitions were completed. Jarowey signed the FAA on behalf of Somerset and Atwell signed the document on behalf of Camelot. Hollister and Holmes are third-party beneficiaries of the FAA.

34.    For a five (5) month period following the execution of the FAA, between August 11, 2009, and January 30, 2010, the Consultants diligently, professionally and successfully completed their obligations under the FAA. They expended a tremendous number of hours and intense effort providing Camelot with exceptional service. They were successful in negotiating and documenting three target acquisitions, including "clearing" film libraries (i.e., confirming ownership of films in those libraries), negotiating stock and employment agreements with the respective principals, organizing a potential capital structure, screening and qualifying potential secured and unsecured lenders, preparing financing and acquisition memoranda with all the necessary attachments and providing Camelot with corporate operating guidance. During

this period, however, Camelot did not pay the Consultants their Advisory Fee in either cash or stock.

35.     In February 2010, recognizing the excellent service provided by the Consultants, Atwell asked Jarowey to continue his (and Holmes and Hollister's) consulting relationship with the Company. The Consultants, however, had not been fully compensated. A new contract was therefore required.

**B.     The February 1, 2010 Business Consultant Agreement.**

36.     On February 1, 2010, Camelot, Somerset and Jarowey entered into a Business Consultant Agreement (the "February 2010 BCA"). Camelot needed Jarowey and Somerset to "render additional, specific business and acquisition consulting activities." The Board had concluded that it was in the Company's best interest to have Jarowey consult with the Board and the Company's officers and administrative personnel "concerning issues which may occur relating to the business of the Corporation, including assisting the Corporation in the structuring and completion of its contemplated corporate acquisitions." One of the purposes of the consulting services was to assist Camelot in transforming itself through acquisitions from a company run by one individual (Atwell) to a modern, public corporation with appropriate checks and balances. The term of the February 2010 BCA was one year with an option to extend. Jarowey and Atwell negotiated and co-drafted the February 2010 BCA.

37.     Under the terms of the February 2010 BCA, Jarowey and Somerset agreed to provide Camelot with business and financial analysis of the Company's business plans, formulate and evaluate structural and financial alternatives, provide the Company with business advisory services, review and analyze all aspects of the Company's structure and its financing

13

and acquisition goals, and provide merger and acquisition and investment banking services. To compensate Jarowey and Somerset, Camelot agreed that they would receive a maximum of $400,000 in shares of the Corporation's $0.0001 par value common stock (the "Common Shares"). The receipt of up to $400,000 worth of Camelot Common Shares was the only compensation for Jarowey and Somerset under the February 2010 BCA; the agreement specifically stated that they would not be receiving warrants or options. The agreement also obligated Camelot to pay Jarowey and Somerset's expenses.

38.     Because Camelot and Jarowey also agreed that Jarowey could be compensated for his services with stock, Section 7 of the February 2010 BCA stipulated that "the Shares would be issued in accordance with the terms and conditions of the Corporation's 2009 Common Stock Option/Issuance Plan which provides for the issuance of shares under Form S-8." Form S-8 refers to a form issued by the SEC. Corporations who report their financial condition and operations to the SEC can register shares pursuant to Form S-8. Such shares are referred to as "S-8 Shares" or "S-8 Stock." Registering shares pursuant to Form S-8 is referred to as an "S-8 Registration."

39.     An S-8 Registration allows issuers to compensate employees and outside consultants with registered shares in lieu of cash. Pursuant to SEC regulations, public corporations can pay their consultants with S-8 Shares, "provided that bona fide services shall be rendered by consultants or advisors and such services must not be in connection with the offer or sale of securities in a capital-raising transaction." Jarowey did not engage in the offer or sale of Camelot securities or in a capital-raising transaction for which he was to be compensated with S-8 Shares under the February 2010 BCA (and the next Business Consultant Agreement, discussed below). Section 7 of the contract explicitly states that, "Somerset and [Jarowey] acknowledge

14

and confirm that none of the services provided in connection herewith are for promotion and/or for financing." By signing the February 2010 BCA, Camelot acknowledged the veracity of that representation.

40.     Section 7 of the February 2010 BCA was essential to Jarowey. S-8 Shares are immediately tradeable; they are not "restricted" or "hold control securities." In order to be traded, restricted shares must either be registered to sell or be exempt from registration. The primary exemption is the "safe harbor" provision found in Rule 144. Rule 144 allows the sale of unregistered shares in the marketplace, without violating Section 5 of the Securities Act, but only if a number of conditions have been met, including a six month holding period. Millions of Camelot shares have been traded on a regular basis in the past several years and the value of the shares fluctuates greatly. Receiving S-8 Stock, and not Rule 144 Stock, was therefore critical to Jarowey and Somerset because it would allow them to immediately trade the stock and take advantage of any increase in the shares' value, or have a reasonable opportunity to obtain value near a trading price at any point as opposed to six months in the future. Because Camelot had a long history of stock dilution, it was essential that Jarowey receive stock with liquidity features.

41.     The importance of receiving S-8 Shares was underscored by the fact that the February 2010 BCA provided that, even in the event of the agreement's termination (other than for certain reasons not applicable here), or the expiration of the agreement, "the terms and conditions of Section 7 of this Agreement [providing for the payment of $400,000 worth of S-8 Shares] shall remain in full force and effect." Jarowey never received $400,000 worth of S-8 Shares as compensation for his services.

42.     Because of the nature of the services being provided to Camelot by

Jarowey and Somerset under the February 2010 BCA, and the nature of their compensation

(receipt of Form S-8 Registered Common Shares, not cash), the agreement contains an

"Equitable Remedies" provision. This provision provides in full that:

> As a result of the uniqueness of the Services to be
> performed by Somerset and [Jarowey] for the Corporation, and
> because Somerset's and [Jarowey's] reputation in the community
> may be affected by the financial success or failure of the
> Corporation, in addition to the other rights and remedies that
> Somerset and [Jarowey] may have for a breach of this Agreement,
> Somerset and [Jarowey] shall have the right to enforce this
> Agreement, in all of its provisions, by specific performance or
> other relief in a court or equity.

43.     The February 2010 BCA incorporated by reference the terms of the FAA

and it was signed by Jarowey and Atwell.

## C.     The Consultants Provided Outstanding Service Under The February 2010 BCA.

44.     During the four month period following the execution of the February

2010 BCA, Jarowey continued working on the Company's strategic plan for acquisitions and he

created the financial models for that plan. He produced memoranda and visited acquisition

targets. He conducted due diligence in connection with the acquisition of certain entertainment

companies (discussed in greater detail below).

45.     Much of Jarowey's work in this period was spent on negotiating the

potential acquisitions, vetting the assets of the target companies, confirming ownership of the

films in the target companies' film libraries, negotiating and drafting acquisition-related

documents, and drafting corporate controls. As with the consulting services provided under the

FAA, the goal of the services provided under the February 2010 BCA was to help transform the

Company from a "one man shop" run by Atwell into a modern and vibrant public media

company with sophisticated and innovative business and financial plans, and with input and

direction from various experts. During this four month period, Hollister and Holmes also

continued to work on financing and acquisition memoranda, screened potential lenders and

acquisition targets, and advised on potential capital structures.

46.     At the close of this four month period, however, the Consultants had still

not been fully compensated for the work they had done since August 2009. By May 2004,

Jarowey was owed $256,500 for services rendered under the FAA and the February 2010 BCA,

and he had only been paid approximately $21,000 in the Company's $.0001 par value common

stock. (Camelot acknowledged the accuracy of these facts in the Recitals of its next contract

with Jarowey and Somerset, as discussed below.) Hollister and Holmes had not received their

$200,000 in either cash or Class G Preferred Stock. Camelot, however, did not have the cash to

compensate Jarowey. The Company, therefore, as part of its next contract with Jarowey,

tendered to him a 5% convertible note dated May 24, 2010 for $256,000 (the "Convertible

Note").

47.     Pursuant to the terms of the Convertible Note, Camelot promised to pay

Jarowey the principal sum of $256,500, or such lesser amount, on or before May 24, 2015,

following the conversion of the note into Camelot stock. The Convertible Note also set forth a

mechanism and formula for converting the Convertible Note into Common Shares. Jarowey was

entitled, at his option, at any time after May 24, to convert all or any lesser portion of the

$265,500 into Common Stock "at a conversion price . . . for each share of Common Stock equal

to the average closing bid price for the Common Stock for the five trading days before the day

that [Jarowey] requests conversion." The Convertible Note provided that Jarowey could convert

the Convertible Note into Common Stock by surrendering the note to the Company together with a conversion notice. The Convertible Note stated that, "[n]otwithstanding the foregoing, in no event shall the Conversion Price be below $0.0001 per share." All Common Shares issued to Jarowey pursuant to the conversion mechanism in the Convertible Note had to be S-8 Shares.

48. Notwithstanding the issuance of the Convertible Note, Camelot still owed the Consultants compensation for the work they had done under the FAA and the February 2010 BCA, and the Company still needed their services. Providing Jarowey with the Convertible Note and parting ways was not an option. Camelot, therefore, continued its pattern and practice of entering into a new contract with further promises of compensation via S-8 Stock in order to retain the Consultants.

D.     The May 24, 2010 Business Consultant Agreement.

49. On May 24, 2010, Camelot, Somerset and Jarowey entered into a new Business Consultant Agreement (the "May 2010 BCA"). Camelot acknowledged in the Recitals of the contract that the consulting services that Jarowey and Somerset had been providing Camelot since August 11, 2009 were "valuable to and benefit[ted] the Corporation." The Company also acknowledged that it was in breach of the FAA and the February 2010 BCA in that the Consultants had not been fully compensated for their services. The agreement also recited that the Board had determined that it was in the Company's best interest to continue to retain Jarowey and Somerset to provide the consulting services they had been providing since August 2009 in connection with Camelot's business and financial planning.

18

50.   The terms of the May 2010 BCA were negotiated by Atwell and Jarowey and they co-drafted the document.  The essential business terms of the contract were as follows (emphasis added):

| Contract Provision | Description |
| --- | --- |
| ¶ 2 - Term | **5 year term** from May 24, 2010 to December 31, 2015. |
| ¶ 6(a) - Base Fee:  Cash | **$210,000 per annum** to be paid monthly (**$17,500 per month**) with an annual Consumer Price Index increase. |
| ¶ 6(b) – Base Fee:  S-8 Common Shares | "In the event the Corporation will be unable to generate the funds necessary to satisfy the cash compensation described in this Section 6(a) for payment of the balance due in any given month, Consultant shall receive **the Corporation's $0.0001 par value Common Stock** ('Shares') as payment for the services rendered from time to time as directed by Consultant until such time as the amount stated herein is paid in full." <br><br> "**All Shares . . . shall be issued** in accordance with the terms and conditions of the [Company's Stock Option/Issuance] Plan, which was registered under the Securities Act with the SEC **on a Form-S-8 registration statement** filed November 5, 2009 and any amendments and/or subsequent Form S-8 registration filings thereto." <br><br> "**All shares** distributed to Consultant under this Agreement or acquired by Consultant by any means whatsoever hereunder during the Term **shall be duly authorized, fully paid, fully vested and nonassessable.**" (¶ 7(c)). <br><br> "[Jarowey] acknowledges and confirms that **none of the services provided** in connection with the registered Shares as identified in this Section 6 **are for promotion and/or for financing.**" |
| ¶ 6(c) – Convertible Note | "[Jarowey] . . . shall receive a Convertible Note for **$256,500** . . . representing all remaining amounts due under the Prior Agreements . . . ." |
| ¶ 7(a) -  Bonus Class A Stock | "In addition to any Shares received in accordance with Section 6(a) and 6(b) above, [Jarowey] shall receive five per cent (**5%) of the Corporation's Class A Convertible Preferred Stock.**" |
| ¶ 8(a) – Bonus/Incentive Compensation | "Upon execution of this Agreement, as a signing bonus, the Consultant shall be entitled to receive an additional . . . . **300,000,000 shares of Common Stock . . . .**" |
| ¶ 8(b) – Additional Bonus | "[Jarowey] shall also be entitled to receive an additional bonus in the amount of . . . **500,000 shares of Class C** convertible Preferred Stock. |
| ¶ 8(b) – Additional Bonus | "[Jarowey] shall also be entitled to receive an additional bonus in the amount of . . . . . . **100,000 shares of Class A** convertible Preferred Stock." |
| ¶ 8(b) – Additional Bonus | "[Jarowey] shall also be entitled to receive an additional bonus in the amount of . . . **25,000 shares of Class D** convertible Preferred Stock." |
| ¶ 9 - Warrants | "[Jarowey] shall be granted **warrants** . . .  entitling [him] to purchase . . . **$1,000,000 of Shares.**" |
| ¶ 10 – Expenses | "the Corporation shall reimburse [Jarowey] promptly in cash or stock . . . for all . . . [of his **out-of-pocket business expenses**]." |

51.    Paragraph 6(b) of the March 2010 BCA specifically obligates Camelot to pay Jarowey in S-8 Shares if it cannot pay him in cash. Paragraph 6(b) also specifies that any shares issued as part of the Base Fee must be S-8 Shares, and not Rule 144 Shares. As with the prior agreements with Camelot, this provision was essential to Jarowey. Any shares issued as compensation for non-financing and non-promotion activities had to be immediately tradeable so that Jarowey could take advantage of the large trading volumes and volatile pricing of Camelot shares. However, at the time of executing the May 2010 BCA, the Company secretly intended to not honor its promise to pay him in S-8 Shares if it did not have the requisite cash to do so.

## SCIENTER ALLEGATIONS

52.    In making the false written representation that it would compensate Jarowey with S-8 Stock, Camelot deliberately intended to deceive, manipulate and defraud Jarowey, and it used the May 2010 BCA as the instrumentality for that deception, manipulation and fraud. Camelot's misconduct was intentional and deliberate. The Company, in other words, had a conscious intent to misrepresent its intention to pay Jarowey in S-8 Stock and the Company's statement that it would pay Jarowey in S-8 Stock was false at the time that it was made. The Company's motivation for making the false representation was simple: it needed to keep Jarowey employed and, in order to do so, it falsely represented that he would be compensated with S-8 Stock. The Company knew that Jarowey and its other consultants would not work for Rule 144 stock and it did not have the money to pay them in cash.

53.    The facts which give rise to a strong and most plausible inference that Camelot had a conscious intent to defraud, and hence acted with the requisite scienter, in making the false and misleading representation that Jarowey would be paid in S-8 Stock are, among others, the following: (i) since May 24, 2010, Jarowey has never received S-8 Shares as

20

compensation for his services; (ii) prior to entering into the May 2010 BCA, Camelot had

contracted with other professionals (including its SEC attorney and its accountants and other

lawyers), also promising them S-8 Shares, (iii) Camelot knew in May 2010 that, because of its

planned use of S-8 Shares for others, and because S-8 Shares tend not to exceed 15-20% of a

Company's issued and outstanding shares, it could not fulfill its obligations to Jarowey under

Paragraph 6(a) of the May 2010 BCA; (iv) many of the professionals and consultants who were

also promised S-8 Shares as compensation have not been issued the S-8 Shares that are due and

owing to them for their services, including, for example, the attorneys J.A. ("Ted") Baer and

Philip Levoff; (v) on or about September 14, 2010, Atwell informed Holmes that he (Atwell)

never had the intention of paying Jarowey amounts owed under the May 2010 BCA; (vi) Atwell

only pays consultants with S-8 Shares that he deems subjectively are worthy of such

compensation, notwithstanding contractual obligations to multiple other professionals; (vii) on

the same day that he executed the May 24, 2010 BCA, Atwell instructed Camelot to issue to him

one *billion* S-8 Shares, thus dramatically reducing the number of S-8 Shares available for other

employees, officers and consultants; (viii) on May 24, 2010, Atwell was planning the Company's

reverse stock split which occurred on June 1, 2010 and which (as Atwell well knew) would result

in the amount of S-8 Shares dropping dramatically to under 300,000, a number which could

never fulfill the contractual obligation of paying Jarowey $210,000 per year for five (5) years in

S-8 Shares as stipulated in Paragraph 6(a) of the contract; and, (ix) in an ill-advised attempt to

stave off this complaint, Camelot, on February 24, 2011, issued to Jarowey two stock certificates

for a total of 701,773,117 shares of Rule 144 Stock with a value of only $70,177.00.

     54.    Camelot's fraud caused an enormous economic loss to Jarowey. On or

about September 2, 2010, the price of Camelot stock had risen an astounding 3,000%. Had

Camelot honored its obligation to pay Jarowey S-8 Shares prior to that date, he would have been able to sell those shares on the open market, which would have resulted in a profit of at least approximately $8 million.

55.     The May 2010 BCA has never been terminated.  Pursuant to Paragraph 26.1 of the contract, there are only seven (7) "Termination Events." They are:  (i) the expiration of the contract's "Term" (December 31, 2015); (ii) Jarowey's death; (iii) Jarowey's disability; (iv) a material breach of the contract which Jarowey has not corrected within 30 days following a written request by the Company that it be corrected; (v) a resolution by the Board that the contract has been terminated for a reason other than because of the expiration of the contract's term, Jarowey's death, Jarowey's disability, or an uncorrected material breach; (vi)  notice of termination by Jarowey "with Good Reason"; or (vii) notice of termination by Jarowey "without Good Reason."  None of the seven (7) Termination Events have occurred.

56.     However, notwithstanding the fact that no Termination Event has occurred, Camelot misrepresented the status of the May 2010 BCA in its Form 10-Q, filed with the SEC on November 22, 2010, for the quarterly period ended September 30, 2010.  On page 15 of that document, Camelot erroneously claimed that the May 2010 BCA had been terminated as of September 17, 2010.

57.     Moreover, even if the May 2010 BCA had been terminated on September 17, 2010 (which it was not), many of Camelot's obligations under the contract survive its termination.  For example, Camelot's obligations to pay Jarowey the "Base Fee" in Paragraph 6 and provide him with warrants in Paragraph 9 "remain in full force and effect until such time as [Jarowey] has been paid in accordance herewith."  Paragraph 26.1(d) also provides that "in the

event that [Jarowey's] engagement with the Corporation is terminated . . . the Corporation shall continue to pay [him] the Base Fee . . . [from] the Consultant's termination of engagement [until] End of Term."

58.    Following the execution of the May 2010 BCA, Camelot blocked Jarowey from realizing the value of the Convertible Note issued to him pursuant to Paragraph 6(b) of the contract. On May 24, 2010, Camelot issued Jarowey a 5% Convertible Note for a principal amount of $256,500 representing all remaining amounts due under the FAA and the February 2010 BCA. On September 7, 2010, Jarowey attempted to convert the outstanding $260,244.34 principal and interest balance of the Convertible Note to common shares in Camelot (the "Note Conversion Shares"). Then, the following occurred:  (i) Camelot allocated the $260,244.34 Convertible Note over a 10-month period ($26,646.18 per month); (ii) on September 7 the Note Conversion Shares were reserved at the Company's transfer agent; (iii) Camelot failed to execute the necessary corporate documents and Jarowey was blocked from accessing the Note Conversion Shares until October 7, rendering them (until that time) un-tradeable and of no value; (iv) while the shares were held and not delivered, between September 7 and October 7, the share price of Camelot stock went from $.09 per share to $.0022 per share, losing over 95% of its value; (v) on October 7, Jarowey received just 80% of the Note Conversion Shares, but these were no longer compliant with the provisions of the May 2010 BCA's anti-dilution provisions (discussed below), and thus caused a significant loss to Jarowey, and, (vi) the remaining 20% of the Note Conversion Shares (the April and May amounts) being held at transfer agent were never delivered and in order to be compliant, if delivered, would have to have been adjusted in an amount to meet the anti-dilution provisions of the May 2010 BCA.

59.     The May 2010 BCA contained significant "anti-dilution" provisions. Pursuant to these provisions, Camelot can dilute the market for its shares but this cannot dilute the value of the shares it is obligated to issue to Jarowey for services rendered. This is accomplished through Camelot's obligation to increase the number of shares it issues to compensate for the dilution occurring in the marketplace. For example, Paragraph 7(a) of the agreement states that:

> During the Term [of the contract], if the Corporation issues additional shares of the Corporation's Class A Convertible Preferred Stock, whether through sale, merger, consolidation, reverse stock split, or any other conversion or issuance that increases the amount of the Corporation's Class A Convertible Preferred Stock outstanding on a fully diluted basis, [Jarowey] shall receive additional Class A Convertible Preferred Stock so that [his] ownership is maintained at five percent (5%) as adjusted on a quarterly basis when taking into account of the Corporation's Class A Convertible Preferred Stock.

Paragraph 7(d) also provides that, "in the event the Corporation issues Shares, or Preferred Stock, at a price per share less than any Issuance Price, then the Issuance Price shall be reduced concurrently with such issue to a price equal to such lower price and the number of Shares issued to [Jarowey] shall be adjusted accordingly so long as the reduced Issuance Price is in accordance with the terms and conditions of the Plan."

60.     However, notwithstanding these anti-dilution provisions, since the execution of the May 2010 BCA:  (i) Camelot has issued additional shares of Class A Convertible Preferred Stock, Common Stock and other classes of Preferred Stock; (ii) this has increased the amount of each class of stock; (iii) as a result, Jarowey's ownership has not been maintained at five percent (5%) of the Class A Convertible Preferred Stock; (iv) Camelot has not provided Jarowey with documentation that his 5% of Class A Convertible Preferred Shares has

been reserved at the Company's transfer agent in his name; and (v) Jarowey does not own 5% of

Camelot's Class A Convertible Preferred Stock as mandated by Paragraph 7(a) of the May 2010

BCA.

61.   Hollister and Holmes are third-party beneficiaries under the May 2010

BCA.  Paragraph D of the Recitals states that:

> On or about May 24, 2010, the Corporation issued to John
> B. Hollister III and Douglas Q. Holmes . . . $100,000 each[,] for a
> total amount of $200,000 collectively, in the Corporation's Class G
> Preferred Stock as payment in full pursuant to the Financial
> Advisor Agreements dated August 11, 2009 entered into between
> [Jarowey] and the Corporation . . . .

This particular Recital was not accurate.  Camelot has never issued to Hollister and Holmes

$100,000 each, for a total amount of $200,000 collectively, in the Corporation's Class G

Preferred Stock.

62.   Furthermore, in its Form 10-Q, filed with the SEC for the quarterly period

ended September 30, 2010, Camelot told the investing public that:

> On May 24, 2010, as part of the [May 2010 BCA] with
> [Jarowey], the Company agreed to issue [Holmes and Hollister]
> $100,000 each, for a total amount of $200,000 collectively, in the
> Company's Class G Preferred Stock . . . .  On or after September 1,
> 2010, [Holmes and Hollister] shall have the right to convert any or
> all of their Class G Convertible Preferred Stock into Two Hundred
> Thousand Dollars ($200,000) in shares of fully paid and
> nonassessable shares of Common Stock at a price equal to the
> quarterly volume weighted average share price per share of
> Common Stock immediately prior to conversion.  As of September
> 30, 2010, the Company has $200,000 included in accounts payable
> related to this agreement.

63.   On May 24, 2010, Atwell and the Company's then-CFO executed a

Certificate of Designation of Class G Preferred Stock, pursuant to Section 151 of the General

Corporation Law of the State of Delaware (the "Class G Certificate"). Pursuant to the Class G Certificate, Camelot certified that, on May 24, it had created a class of 1 million shares of Preferred Stock designated as "Class G Preferred Stock" with a par value of $.0001 per share. The Class G Certificate contained a Right of Conversion provision. This provisions stated, in relevant part, that, after September 1, 2010, holders of Class G Preferred shares could "convert any or all of their Class G Convertible Preferred Stock into Two Hundred Thousand Dollars ($200,000) in shares of fully paid and nonnssessable shares of Common Stock" at a certain price. The certificate also provided that, "holders of Class G Convertible Preferred Stock shall have the right to convert any or all of their Class G Convertible Preferred Stock into 50 shares of fully paid and nonassessable shares of Common Stock for each share of Class G Convertible Preferred Stock held up to a maximum value of $200,000." By limiting the conversion to only 50 Common Shares for each Class G Share, Camelot made it extremely difficult, if not absolutely impossible, for Holmes and Hollister, as holders of Class G Preferred Shares, to acquire Common Shares worth $200,000, because with a maximum of 1 million Class G Shares, Holmes and Hollister could only obtain 50,000,000 Common Shares which are only worth $5,000.00 today.

64.     The Class G Certificate also stated that the Company would reserve "sufficient shares of Common Stock to provide for the conversion of all outstanding shares of Class G Convertible Preferred Stock," and that all Common Stock issued upon conversion would be "validly issued, fully paid and nonassessable." The Class G Certificate was filed with the State of Delaware on August 5, 2010. The Class G Certificate was illusory in that the provisions of the certificate were insufficient to deliver the obligated stock.

65.     As with the previous agreements, the May 2010 BCA provides Jarowey with the right to specific performance.  Paragraph 21 ("Remedies") provides in relevant part that:

> as a result of the uniqueness of the Services to be performed by [Jarowey] for the Corporation, and because [Jarowey's] reputation in the community may be affected by the financial success or failure of the Corporation, in addition to the other rights and remedies that [Jarowey] may have for a breach of this Agreement, [Jarowey] shall have the right to enforce this Agreement, in all of its provisions, by specific performance or other relief in a court or equity.

This right addresses all of the obligations under the May 2010 BCA including the obligation of Camelot to deliver the Class G Shares with sufficient rights to accomplish the contractual obligations to Messrs. Holmes and Hollister.

66.     Camelot is in breach of the May 2010 BCA.  Camelot has not paid Jarowey his Base Fee in cash.  Camelot has not paid Jarowey his Base Fee in non-restricted, non-Rule 144, S-8 Shares.  Camelot has not paid Jarowey his Bonus Stock or his Incentive Compensation.  Camelot made it impossible for Jarowey to realize the full value of the Convertible Note.  Camelot has not paid Jarowey his expenses of approximately $10,000 in either cash or S-8 Shares.  Camelot has not issued Jarowey his warrants.  Camelot has not kept Jarowey's ownership of Camelot's Class A stock at 5%.  Camelot has not issued $200,000 worth of Class G Preferred Shares to Messrs. Hollister and Holmes.  Moreover, had Camelot paid Jarowey non-restricted S-8 Shares as mandated by the May 2010 BCA, Jarowey would have been free to sell those shares in the open market and would have realized approximately $8 million in profit.  Camelot's breaches of contract and duty have caused significant losses and damages.

## II.   ATWELL AND ISTOCK BREACHED THEIR FIDUCIARY DUTIES TO CAMELOT AND ITS SHAREHOLDERS.

67.     Atwell is the Chairman, President and CEO of Camelot, a public corporation. Istock is the CFO of the Company and a member of the Board of Directors. As officers of the Company, Atwell and Istock owe Camelot and its shareholders a duty of care and a duty of loyalty. They have a fiduciary duty to act in good faith and in the best interest of the corporation. They are required to refrain from self-dealing, usurping corporate opportunities and receiving improper personal benefits. Moreover, because Camelot is unable to pay its debts as they become due and because its assets are worth less than its liabilities, Camelot is insolvent and, therefore, as Directors, Atwell and Istock also owe fiduciary duties to the Company's creditors.

### A.   Atwell Breached His Fiduciary Duties By Directing Camelot To Execute A Dramatically Lucrative Employment Contract With Him That Constitutes Corporate Waste.

#### 1.   Atwell's History Of Using His Power And Authority To Enrich Himself At The Company's Expense.

68.     On March 31, 2003, the operations of the company "Camelot Films" were absorbed into Camelot as part of a corporate restructuring. As a result of the restructuring, Atwell became Chairman, President and CEO of Camelot. Atwell then, among other things, adopted a new "business model" to pursue the development, production, marketing and distribution of motion pictures. He became responsible for "restructuring the overall business framework" for the Company and developing "a new plan of operations for implementation during 2004." Part of Atwell's restructuring, however, was to make sure that he was handsomely compensated for his services.

28

69.     In its Form 10-K for the fiscal year ended 2003, Camelot asserted that "Our success and future growth depends on our ability to attract and retain qualified employees throughout our business. Specifically, we are dependent on our officers and directors, including President and Chief Executive Officer Robert P. Atwell." This statement was not accurate. It was included in the Company's 10-K to justify an outrageously high salary for Atwell in both cash and stock. As of March 19, 2004, Atwell was the beneficial owner of approximately 66% of the Company then-outstanding Common Stock. The concentration of the Company's common stock ownership, combined with his position as CEO, gave Atwell tremendous power over Company decisions. Atwell's concentration of ownership blocked the ability of other shareholders to impact matters requiring shareholder approval. As a result, since March 2003, Atwell, acting alone, has been able to exercise almost sole discretion over all matters requiring shareholder approval, including the election of the entire Board and approval of significant corporate transactions, including acquisitions.

70.     From 2003 to 2011 Atwell has used his powers to enrich himself and his family at the expense of Camelot. In 2003, for example, the Atwell Group (an entity owned by Atwell) starting leasing office space to Camelot for $72,000 per year and he accrued a salary of $250,000 which he converted to stock in 2004. He was issued 66% of the Company's common stock. During the same time, however, by December 31, 2004, the Company earned revenues of only $59,000 with operating costs of over $7 million, leaving a net loss of approximately $7.3 million. The Company has never declared or paid cash dividends on its Common Stock.

71.     It was also on Atwell's watch that the decision was made to "issue every individual working on our films shares of our $.001 par value common stock as part of their compensation package or vendor contract." It was during this period that Atwell started the

29

trend of making promises of issuing common stock for services rendered that he could never hope to keep. As Camelot bragged in its Form 10-K for the fiscal year that ended in 2004, "To the best of our knowledge, no other publicly traded film company has ever utilized common stock to incentivize all of its creative, production and management resources." Atwell, however, overpromised. As happened to Jarowey and other employees, vendors and consultants, Atwell promised S-8 Stock he could not deliver because public companies tend to only register up to 15-20% of their issued and outstanding shares as S-8 Shares in any given registration.

72.     From 2004 until the present day, Atwell has owned the vast majority of the Company's preferred stock; for many years (and today) he was one of only two individuals on the Compensation and Audit Committees; and his salary (in comparison to the Company's meager revenues) stayed astronomically high. In 2004, for example, Atwell owned 62% of the Company's common stock and gave himself a salary of $250,000. In June of that year, Atwell authorized the issuance of 11 million restricted common shares to himself and an additional 4.6 million restricted common shares to Eagle Consulting Group, Inc. ("Eagle'), the President of which was, at one point, Atwell's wife Tamara, and then Atwell himself. On December 31, 2004, he had the Company authorize an additional issuance of 2.9 million shares of common stock at an agreed upon price of $.03/share to Eagle. The issuance was exempt from registration under Section 4(2) of the Securities Act and no underwriter was involved in the offer of sale of the shares. In 2004, Atwell also had the Company authorize the issuance of 3.5 million restricted common shares to The Corporate Solution, Inc., a company which is also owned by Atwell.

73.     Through the years Atwell continued to own a controlling interest in Camelot's voting stock and investors had no voice in the Company's management. Because the ownership of Camelot's common stock continued to be concentrated in shares owned by Atwell,

this prevented stockholders from influencing any significant corporate decision and resulted in conflicts of interest that caused the Company's stock price to decline. On January 5, 2005, Atwell authorized the issuance, to himself, of 5.1 million shares of its Class A Preferred Stock, and 5.1 million shares of its Class B Preferred Stock. By December 31, 2005, Atwell owned 63% of the Company's outstanding Common Stock.

74.    By December 31, 2006, Atwell and his affiliates owned or controlled 99.4% of the votes cast in any stockholder vote and 62% of the outstanding Common Shares. One of the primary expenses for Camelot in 2006 was Atwell's salary, which was $250,000. And yet, by December 31, 2006, Camelot's Net Loss was approximately $14 million and the value of its common stock declined in 2006 and 2007 from a bid share price of $0.160 per share to a bid share price of $0.007 per share.

75.    As the years went on Atwell continued to enrich himself with Company stock. In 2007, he authorized the Company to issue to The Atwell Group 400,000 Rule 144 common shares for loans and "services." By the end of 2007, the Atwell Group was the beneficial owner of 4.4 million Class A Preferred Stock. The Series A Preferred Stock converted to 4 shares of common stock for every one share of Series A Preferred Stock and each share of Series A Preferred Stock was entitled to 50 votes. While the Atwell Group was receiving millions of preferred shares, Camelot did not generate any revenue for the year that ended on December 31, 2007, a year in which Atwell's salary remained at $250,000 per annum.

76.    During this period, Atwell regularly instructed Camelot to issue false and misleading statements in its public filings. In its Form 10-K for the year ended 2007, for example, Camelot claimed that it had adopted a "Code of Ethics" that applies to all officers and

31

directors and that the Code could be found on the Company's website. This statement was a lie. No Code of Ethics was ever finalized and it is not available on the Company's website.

77.   By 2008 Atwell had used his power at the Company to become the beneficial owner of 83% of the Company's Series A Convertible Preferred Stock, 84% of its Series B Convertible Preferred Stock, and 84% of its Series C Convertible Preferred Stock. Atwell's ownership of the Company's Series A Preferred Stock entitled him to 50 votes and each share of his Series B Preferred Stock entitled him to 1,000 votes. In the aggregate, Atwell was entitled to cast 76% of the votes in any vote by the Company's stockholders. In 2008, Atwell was one of only two directors who sat on the Board and only one of two members of the Company's Audit and Compensation Committees.

78.   Atwell used his ownership and voting power to extract contracts from the Company which were not in the Company's best interest and hence Atwell continued to be grossly overpaid in both cash and securities. In 2008, for example, Atwell authorized Camelot to issue him 248 million shares and to issue the Atwell Group 178 million shares in exchange for loans and "services." Atwell's wife Tamara was issued 82 million non-restricted S-8 Shares allegedly for her "administrative services to the Company on an as needed basis." Upon information and belief, however, Mrs. Atwell did not provide "administrative services" justifying a payment of 83 million S-8 Shares. In 2008 Atwell increased his salary to $420,000. By the end of the fiscal year 2008, Atwell owned 34% of the Company's common stock. The next largest common stock owner on the Board was the Company's CFO, who owned only 4% of the Company's common stock. Because of his ownership and voting power, there were no limits to Atwell's largess to himself and his family with Camelot stock and cash. As of December 31,

2008, Atwell had accrued $761,000 in compensation from Camelot. During 2009, Atwell issued himself an additional 250 million S-8 Shares for "services."

79.     The trend of issuing himself an exorbitant amount of common and preferred shares, and paying himself a magnificent salary (when compared to the Company's meager revenues), continued unabated. For the fiscal year which ended in 2009, Atwell gave himself a salary of $420,000 (the CFO earned $150,000). But Atwell's self-imposed Camelot-backed largess reached its apotheosis in April 2010 when (as only one of two members of the Compensation Committee), he approved a stunning new employment agreement with the Company.

### 2.     The Atwell Employment Agreement.

80.     On April 26, 2010, Atwell instructed Camelot to enter into an employment agreement with him (the "Atwell Employment Agreement"). The two-member Board "approved" the terms and conditions of the Atwell Employment Agreement on January 6, 2010 and "ratified" the agreement on April 26.

81.     The Atwell Employment Agreement is an egregious example of self-dealing, a breach of Atwell's fiduciary duty and corporate waste. Using his power as only one of two members of the Compensation Committee, Atwell wrote for himself an employment agreement which provides him with benefits that are not in any way commensurate to the minimal value he has brought to the Company.

82.     Pursuant to the terms of the Atwell Employment Agreement, Atwell receives from Camelot (emphasis added):

- A seven (7) year term of employment;

- An annual Base Salary of a minimum of $500,000 in either cash or common or preferred stock;

- A Signing Bonus of $500,000;

- Deferred Compensation equal to 120% of the Base Salary for each year the Deferred Compensation is earned;

- A salary of $4 million per year for five (5) years if he becomes an "Advisor/Producer" for the Company;

- 5 million shares of Class A Convertible Preferred Stock;

- 10 million shares of Class B Convertible Preferred Stock;

- 5 million shares of Class C Convertible Preferred Stock;

- 5 million shares of Class D Convertible Preferred Stock;

- 1 billion shares of Common Stock;

- A "Base Bonus" of no less than $250,000 in cash;

- Eligibility for a "Target Bonus" of $250,000 for 2010;

- Eligibility for a "Target Bonus" of $500,000 for each year after 2010;

- Eligibility for an "Additional Target Bonus" of $1 million per year;

- Eligibility for a "Company-Wide Performance Bonus" to be based on goals delineated by the Compensation Committee (of which he is one of only two members) with his "meaningful input";

- A seven (7) year option to purchase 3 million shares of Class B Convertible Stock that, together with other benefits, is equal to $2 million;

- Eligibility to receive a "Discretionary Option Grant" to purchase additional shares of Class B Convertible Stock;

- An award of restricted stock units with an initial grant date value of $1 million and each subsequent grant having a grant date value of $500,000 based on performance goals set by the Compensation Committee (of which he is one of only two members) and payable only in Common Stock;

- An Additional Performance Bonus equal to 5% of the total investment value raised by the Company;

- Ten percent (10%) of all of the Company's net profits;

- Two percent (2%) of all Monies generated by the Company;

- An option to purchase Common Stock equal to 10% of the outstanding shares of the Company on an annual basis;

- An entitlement to purchase 1 million shares of Class A Convertible Preferred Stock and an option to purchase 1 million shares of Class B Convertible Preferred Stock;

- An entitlement to an additional 10 million warrants;

- A Transportation Allowance of $48,000 per year;

- A Housing Allowance of $120,000 per year;

- A Wardrobe Allowance of $10,000 per month;

- A Screening and Equipment Allowance of $700,000;

- In the event he is required to provide a Personal Guarantee in connection with any business of the Company, the right to receive in cash and/or stock an amount equal to <u>120%</u> of the Personal Guarantee provided;

- Payment of all of his taxes incurred during the seven (7) year term of the contract;

- Reimbursement of personal legal and accounting expenses in an amount not to exceed $100,000 per year;

- A fully furnished Company apartment within 10 miles of any Los Angeles office; and,

- Auxiliary staff.

The Atwell Employment Agreement is worth approximately $50 million over seven (7) years, which is five (5) times the market value of the Company and fifty (50) times more than its revenue.

83.     The Atwell Employment Agreement also gives Atwell total control of the Company, *forever*.  There can be no Chairman of the Board of Directors other than Atwell, and if (as majority shareholder) he elects himself as Chairman, he "shall serve as Chairman of the

Board *in perpetuity*" (emphasis added). It provides that no officer, director, employee, agent or consultant can have a title, position, authority and/or compensation package that is superior to that of Atwell's. Atwell is given "full business and creative control within the Company." The Company is not allowed to take "any action or implement any directive or resolution in any matter or way whatsoever that would cause [Atwell] to lose his voting control of the Company's common and/or preferred stock." Atwell is only obligated to accept an "additional office" at the Company if it is "consistent with [his] position . . . and [his] stature." The Company is contractually bound to always name Atwell as a member of the Compensation Committee. No employee of the Company can have a base salary greater than Atwell's.

84.    The Board did not appoint or obtain an independent representative or advisor to evaluate the employment contract's fairness or to issue a fairness opinion.

**B.    Atwell And Istock Breached Their Fiduciary Duties By Putting Their Personal Economic Interests Ahead Of Camelot's And Failing To Acquire Entertainment Companies Which, Had They Been Acquired, Would Have Dramatically Increased Camelot's Value.**

85.    Camelot has three major divisions:  Camelot Film Group (media production and distribution), Camelot Studio Group (site acquisition, design and development), and Camelot Production Services Group (production support and technology services). Camelot spent years negotiating with potential partners for the development of a studio site in Orange County, California. The negotiations went nowhere; the studio was never built; and Camelot lost $15 million in the failed endeavor. For years, Camelot had no earnings but significant costs (including Mr. Atwell's salary, and later Mr. Istock's). In or around 2009, therefore, Camelot management decided that the Company needed a new business strategy and turned to Jarowey,

an entertainment and media attorney Ted Baer, and Messrs. Holmes and Hollister for advice and counsel.

86.     During the week of July 27, 2009, Jarowey met with Camelot executives to map out a new business strategy for the Company. Jarowey explained that the way ahead for Camelot was through acquisitions. The plan was to purchase media companies that had what is known in the business as "content" (i.e., film libraries and on-going productions). Camelot would then take that content and either distribute it or re-make it (also known in the industry as "re-purposing" the content). The business plan also included acquiring facilities that could offer post-production services (editing the work and rerecording and adding visual special effects). Through these acquisitions Camelot would become a vertically integrated independent film company. The acquisitions would also turn Camelot from a non-earnings-generating company into an earnings-generating company. The Company, therefore, after the acquisitions, would be able to do a stock offering and use proceeds from that offering to pay off debts accumulated in connection with the acquisitions and finance future growth.

87.     The acquisitions were the only way forward for Camelot. For years, it had been a minor player in the industry, it had never generated significant revenue, it was close to bankruptcy and it did not have the resources or talent to create enough original content and build a viable media company. Without the acquisitions, Camelot's survival was in doubt.

88.     Camelot, however, did not have the funds to make the acquisitions. Camelot was, however, a public company with millions of common shares and a market for those shares. (The volume of trades of Camelot shares was so high relative to its size, in fact, that the Company's Common Stock was subject to a "chill" by the Depository Trust and

Clearing Corporation on October 12, 2009.) Therefore, in order to purchase the target

companies, the Consultants recommended that Camelot utilize its stock as currency. The idea

was to create a tax-deferred purchase of 51% of the shares of the target companies using Camelot

stock, borrow money from an asset-based lender (using the target companies' assets as

collateral), and then use those borrowed funds to purchase the other 49%, make a down payment

in cash to the principals, and run the companies.

89.    The advantages to Camelot in acquiring the target companies in this way

were immense. There would be no draining of funds from the parent company (Camelot);

Camelot would not have to put up any of its own assets as collateral; and Camelot would be

acquiring an impressive amount and quality of content, including significant film libraries.

90.    The Consultants eventually identified three target companies: (i)

Cineworks Digital Studios, Inc. ("Cineworks") (a Miami and New Orleans-based post

production studio); (ii) Barnholtz Entertainment, Inc. ("Barnholtz") (a California-based

independent production and distribution company with the ownership or distribution rights to

over 150 films), and (iii) Revelation Entertainment (U.K.) ("Revelation") (a video production

company which also owns an extensive film library). It was estimated that it would cost $15

million to acquire the target companies. Camelot, Jarowey, Ted Baer, and representatives from

the target companies worked on the deal for 12 months. Holmes and Hollister assisted in

advisory and placement efforts. The business plan called for an acquisition of Cineworks first,

followed by Barnholtz and Revelation.

91.    Cineworks was willing and able to close on the deal. It saw significant

synergies between Camelot and itself and tremendous future value once all of the companies

were eventually combined. The benefits to Camelot and the target companies were so impressive that, when the negotiations started, Cineworks insisted that Camelot raise $4 million on its own, but it then agreed to reduce that number to $1.2 million, and, when Camelot was incapable of raising even that small amount, it agreed that Camelot could borrow against Cineworks' assets. This was highly unusual for Cineworks, but the potential benefits were so great that it agreed. But, as the negotiations progressed, the target companies had two concerns.

92.     First, many of the principals at the target companies were worried about a deal in which Camelot would borrow from an asset-based finance company and there would be no restrictions on the amount of money being "upstreamed" to the parent. They did not want Atwell and Istock to have an unlimited access to funds given the Company's history of spending money that went nowhere (as in, for example, the $15 million lost on the failed studio), the fact that Camelot had no history of earnings, and excessive corporate employment agreements that would deplete the Company's cash. Second, the target companies wanted a role in deciding how the new integrated company would be run. Cineworks, for example, demanded a seat on the Board. Atwell and Istock refused. The targeted companies wanted proper financial controls in place. Atwell and Istock refused.

93.     Prior to the negotiations with the target companies, on April 28, 2010, as part of its acquisition strategy, Camelot had acquired the assets of Liberation Entertainment, Inc. ("Liberation") (an entertainment distribution company), including its film library, for approximately $4 million. Camelot paid cash and issued shares of its common and preferred stock to complete the acquisition, but, unlike the Cineworks deal, there were no restrictions on upstreaming cash from the new division, and the Liberation owners did not demand a role in decision-making at Camelot. Camelot had borrowed $650,000 from the Utah finance firm

Incentive Capital LLC ("Incentive") and it used those funds to purchase Liberation's assets. On March 25, 2011, Incentive sued Camelot, Atwell and Istock in the United States District Court for the District of Utah for breach of contract, fraud, conversion and related claims arising from that loan.

94.     As the negations with Cineworks went on for month after month, it became clear to the target companies that Atwell and Istock were not negotiating in good faith. The individual Defendants Atwell and Istock did not want to give up any of the control, autonomy and prestige they enjoyed as the President and majority shareholder of Camelot, and CFO, respectively. Atwell went so far as to tell the Consultants that one reason he wanted the Atwell Employment Agreement finalized was because he knew that if the Company acquired the target companies, and new people came on to the Board, he would never be able to have such a one-sided employment contract.

95.     Once it was clear that Camelot could not even raise $1.2 million as part of the package for purchasing Cineworks, the Consultants introduced Atwell and Istock to the asset-based financing firm of Advisco Capital Corp. ("Advisco"). Advisco is based in New York and it manages, among other things, a $208 million investment fund. Advisco liked what it saw and it had previously lent to post-production studios. It concluded that the synergies between Camelot and the target companies were favorable and that the value of the combined companies would be extraordinary. Advisco, therefore, was willing to loan Camelot up to $1.5 million to complete the acquisitions of Cineworks, using Cineworks' assets as collateral. They agreed to a two-year loan and a one-year option to renew. On July 14, 2010, Advisco issued a conditional commitment for loaning the money to complete the acquisition of the Cineworks assets and

stock, with terms and conditions acceptable to the Cineworks principals. The final negotiated price for Cineworks was approximately $3.8 million.

96.     However, like the target companies, Advisco had conditions. It was not about to write a check to Camelot and let Atwell and Istock run the new, integrated company the same way Atwell had been running Camelot since 2003. Advisco's biggest concern, given Camelot's precarious financial condition, was that Atwell and Istock not be allowed to upstream funds from the newly acquired companies (which would be divisions in the new company) to Camelot. Advisco was concerned that Atwell and Istock would upstream the funds and not use them in the newly integrated company's best interest. Advisco, therefore, told Atwell and Istock that that it could not close the deal unless Atwell and Istock agreed to restrictions on how they would be allowed to use the borrowed funds.

97.     Atwell and Istock refused. They put their personal interests ahead of the interests of the shareholders and of Camelot. Atwell wanted to retain the control he had enjoyed for so many years and Istock was not about to support any acquisitions which would dilute Atwell's control and hence his position as well. Atwell stated categorically to the Consultants that he could not live with any limitations on upstreaming cash to the parent company. As late as August 2010, Istock emailed Atwell that Camelot should not commit to anything with Cineworks and Advisco because "we still have to figure out . . . funds movement we need between parent and new sub." Even though the acquisitions of the target companies were in Camelot's best interest –they would save the Company from further economic decline and create tremendous value for the shareholders – Atwell did not want to give up his personal ATM (Camelot), and Istock did not want his protector's power diluted. For years, Atwell had extracted outrageous

salaries and stock options and, while the negotiations to purchase the target companies were on-going, he was busy drafting the Atwell Employment Agreement.

98.    Atwell and Istock put their personal interests ahead of the interests of Camelot and its shareholders and refused to close the deals. Atwell and Istock told Advisco and Cineworks that Camelot didn't need Advisco's money (and restrictions) because they could raise between $25 and $30 million to do with as they pleased. This was a lie. Atwell and Istock could not even raise the $1.2 million that Cineworks originally wanted as part of the deal. At one point during the negotiations, Vijay Chandran, the president of a boutique investment bank Cauvery Group, Inc., was asked to consider financing options for the Company. He told Atwell and Istock that they could not get a better deal than the one Advisco proposal. Atwell and Istock refused to listen to him.

99.    In August 2010, Advisco finally had to withdraw its offer because Atwell and Istock refused to agree to the terms of the financing. Cineworks was outraged having invested over 12 months in negotiations (it signed its first Letter of Intent with Camelot on August 25, 2009). Cineworks asked for a break-up fee which Camelot refused to pay. With the Cineworks acquisition dead, negotiations to acquire Barnholtz and Revelation atrophied, and those deals never closed as well.

100.    Atwell and Istock's decision to not acquire the target companies was catastrophic. The benefits to Camelot and its shareholders would have been staggering. Going into the deal, the only advantage Camelot had was that it was public company and there was a market for its stock. Camelot had no significant operating history and all it had of any real value was its substantial trading volumes. The core of the business plan, therefore, had been to turn

Camelot into a legitimate operating company with divisions that had actual earnings. Because there was already a market for Camelot's stock, after the acquisitions, Camelot shareholders would have received tax-deferred treatment on the payment of taxes on the entire purchase price and, as earnings increased, the share price of Camelot's common shares would have risen as well. The target companies would have continued to run their businesses and access to the public markets would have allowed Camelot to provide them with funds for expansion.

101.   The acquisitions, when combined with the Camelot distribution and film operations, would have generated estimated Earnings Before Income, Taxes, Deductions and Amortization ("EBIDTA") of between approximately five to six million dollars per year in an industry where the average price-to-earnings ratio was 17 (i.e., the stock is priced at 17 times forward earnings). This would have created a company with an estimated market value of between 85 and 100 million dollars. Moreover, since Atwell and Istock broke off negotiations, the value of the target companies has continued to increase. For example, Revelation Films made its own acquisition increasing its size, and Cineworks is projecting Fiscal Year 2011 earnings that are six (6) times what they were when the discussions with Camelot began in August 2009.

102.   Atwell and Istock breached their fiduciary duties to Camelot and its shareholders by putting their personal need for total control and unfettered access to cash from the target companies above the best interests of the Company. Before the aborted acquisitions, the only way Camelot could increase its share price was by acquiring companies that had earnings which, in turn, would prevent a "free-fall" in the Company's share price. By not acquiring the target companies, however, this is exactly what did happen: Camelot shares have dropped from a high of $2.00 per share on July 1, 2010, to today's price share of $0.0001 per

share.  At the time that Atwell and Istock refused to close the deals, Cineworks was on target to

produce EBITDA of $1.7 million in 2010 and $2.2 million in 2011.  Had the acquisition of *just*

Cineworks been completed, Camelot would have been worth a minimum of $37 million today as

opposed to its present-day market value of $960,000.   Moreover, had Atwell and Istock

approved the acquisitions of all four companies, Camelot would have been worth a minimum of

$85 to $100 million.

103.    The only reason that the acquisition strategy was halted was because

Atwell wanted to retain ultimate control and Istock did not want his protector's power being

diluted by one iota.  Atwell would have lost his control because a substantial number of new

preferred shares would have been issued to persons other than Atwell.  Moreover, Atwell and

Istock would have been forced into sharing decision-making authority with principals from the

acquired companies.  An opportunity to build shareholder value was lost because of Atwell's

desire to keep the control he had enjoyed since 2003, and which had resulted in, among other

things, the funding of his lifestyle through salary, stock, and the sale of Camelot notes.  Istock

also put his personal interest ahead of the Company's by jettisoning his independence, following

his boss's lead, and deciding against the acquisitions, all in order to protect Atwell's power.

**First Claim for Relief**
**(Violation of Rule 10b-5 of the Securities**
**Exchange Act Against Camelot and Atwell By Jarowey)**

104.    Plaintiffs repeat, reallege and incorporate the allegations contained in

paragraphs 1 through 103 as if fully set forth herein.

105.    Pursuant to the terms of the May 24, 2010 Business Consultant Agreement

(the "Contract"), Jarowey was to be paid in S-8 Shares in exchange for his labor if the Company

did not have the necessary funds to pay him. Jarowey was a purchaser of Camelot's S-8 Shares in that by providing services to Camelot he purchased Camelot's S-8 Shares. The Contract, therefore, was for the purchase of a security by Jarowey (and the sale of that security by Camelot) within the meaning of the Securities Exchange Act and Rule 10b-5. The Contract is also a security within the meaning of the Securities Exchange Act.

106.   In the negotiation of, and otherwise in connection with, the execution of the Contract, Camelot and Atwell used the mails and instrumentalities of interstate commerce, including email, telephone and fax.

107.   As detailed above, at the time of executing the Contract, Camelot, through Atwell, represented to Jarowey that he would be paid in S-8 Stock if the Company did not have the funds to do so. This representation was false when made and it was part of a ploy designed to secure the benefit of the Consultants' knowledge and expertise. At the time of the representation, Camelot (through Atwell) did not intend to compensate Jarowey with S-8 Stock if it did not have the funds to do so.

108.   When the Contract was signed, Camelot, through Atwell, failed to disclose to Jarowey that he would not be issued S-8 Shares in Camelot if the Company did not have the cash to pay him. By failing to make this disclosure, Camelot and Atwell omitted to state facts necessary in order to make Atwell's statements to Jarowey, in light of the circumstances under which they were made, not misleading.

109.   The facts misstated, as well as the facts not disclosed, were material to Jarowey, and would have been material to any other reasonable person in the same position.

Camelot and Atwell were aware of the material facts that were not disclosed and knew their significance to Jarowey's decision to sign the Contract.

110. By misrepresenting its intention to pay Jarowey with S-8 Shares at the time of executing the Contract if the Company did not have the necessary funds, Camelot and Atwell employed a scheme to defraud Jarowey in connection with his purchase of Camelot stock via his labors. Moreover, the promise to pay Jarowey in S-8 Shares without the intention of fulfilling that promise was deliberately, intentionally and consciously fraudulent. In contracting to pay Jarowey in S-8 Shares if cash was not available to do so, there was an implied representation by Camelot and Atwell that the Company would act in good faith and actually pay him in S-8 Shares if cash was not available to do so. The misrepresentation relating to Camelot's intent affected the value of the security because it made the contractual obligation valueless since Camelot did not intend to honor it.

111. Camelot and Atwell sold Camelot securities in exchange for Jarowey's sweat equity while secretly intending from the very beginning not to honor Camelot's benefit of the bargain. By failing to disclose the intention not to perform under the Contract, the Contract did not contain full and fair disclosure in connection with Camelot's intended issuance of its securities, thus violating Rule 10b-5.

112. At the time he signed the Contract, Jarowey did not know, and had no reason to suspect, the truth of the facts misrepresented or the existence of the facts that were not disclosed.

113. Jarowey reasonably and justifiably relied on the misrepresentation and on the non-existence of the facts that were not disclosed.

114.   As a proximate result of his reasonable reliance, Jarowey suffered significant damages, including, among others: (i) the profit Jarowey would have received had the S-8 Shares been issued as they should have been, at a time when the price of Camelot shares skyrocketed 3,000%, and (ii) consequential damages for the loss of other business opportunities, in an amount to be proved at trial.

115.   All conditions precedent to this claim have occurred or been fulfilled.

### Second Claim for Relief
### (Breach of Fiduciary Duty Against Atwell and Istock by Shareholder Jarowey)

116.   Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 115 as if fully set forth herein.

117.   Atwell and Istock owe fiduciary duties to Camelot as officers and directors of Camelot. Atwell and Istock breached those fiduciary duties by, among other things, failing to acquire Cineworks, Barnholtz and Revelation (the "Target Companies") in order to maintain control of the Company and protect their access to salary and stock benefits (the "Acquisitions"). Atwell also breached his fiduciary duties by ordering Camelot to enter into the Atwell Employment Agreement which provided him with monetary and other benefits which far outweighed his contribution to the Company and was, therefore, a waste of corporate assets. The failure to acquire the Target Companies and the decision to have Camelot execute the Atwell Employment Agreement are referred to herein as the "Transactions."

118.   In pursuing their self-serving course of conduct, Atwell and Istock were faithless fiduciaries who acted in a manner that was completely adverse to the interests of Camelot. As Directors in Camelot, Atwell and Istock had a material interest in the Acquisitions

47

and those interests were inconsistent with those of the Company. One the one hand, by not acquiring the Target Companies, Atwell and Istock keep total control of the Company and they have preserved their never-ending spigot of cash, stock and decision-making powers. On the other hand, the Acquisitions would have greatly increased the value of the Company and the value of the Company's common shares.

119.    Similarly, Atwell had a material interest in the Atwell Employment Agreement which is inconsistent with those of the Company. One the one hand, the Atwell Employment Agreement enriches Atwell tremendously and leaves him as Chairman of the Board "in perpetuity." And, on the other hand, a more balanced and less wasteful employment contract would have, among other things, saved the Company money, made third-party financing easier, and allowed for a more robust decision-making process.

120.    Atwell and Istock, therefore, received personal benefits from the Transactions and acted in bad faith by consciously disregarding Camelot's interests. Moreover, in making these decisions, Atwell and Istock knowingly and completely failed to undertake their responsibilities as officers and members of the Board. They disregarded an acquisition strategy that would have enriched the Company and increased the value of the Company's common shares because they did not want to give up control and access to cash and stock. Atwell also drafted and had executed a highly extravagant and wasteful employment agreement. Atwell and Istock, therefore, were interested in the Transactions and they acted out of bad faith and with a conscious disregard of their fiduciary duties.

121.    Atwell and Istock were engaged in self-dealing and their conduct was wrongful, without justification or excuse and contrary to generally accepted standards of

morality. In addition, the acts and omissions of Atwell and Istock were committed with actual malice and/or a wanton and willful disregard of Camelot's rights and, in light of their roles as officers and directors of the Company, represent unconscionable and unjustifiable conduct.

122.    By reason of the foregoing, Camelot has been damaged in an amount to be determined at trial.

123.    All conditions precedent to this claim have occurred or been fulfilled.

**Third Claim for Relief**
**(Corporate Waste Against Atwell and Istock by Shareholder Jarowey)**

124.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

125.    The individual defendants Atwell and Istock are liable for waste for approving a compensation ratio to Atwell in an amount so disproportionately large to his contribution as management, as opposed to capital, as to be unconscionable.

126.    On April 26, 2010, Atwell and Istock, as member of the Compensation Committee and Directors of the Company, instructed Camelot to execute an employment agreement with Atwell (the "Atwell Employment Agreement"). The Board did not hire or rely on any compensation expert in drafting, approving or ratifying the Atwell Employment Agreement. No fairness opinion was issued.

127.    The Atwell Employment Agreement provides Atwell with, among other things, twenty-five (25) million shares of Preferred Stock, one (1) billion shares of common stock, a salary of $500,000 per year, bonuses of $750,000, and life-time tenure as Chairman of

the Board. The Atwell Employment Agreement was executed in April 2010 when, according to the Company's Form 10-K for the fiscal year that ended in 2009 (just four months earlier), "Camelot ha[d] generated only limited revenues from inception through December 31, 2009" and "[it] did not earn any revenues during fiscal year 2009." The Company's Net Loss for the year that ended in 2008 had been approximately $430,000, whereas the Company's Net Loss for the year that ended in 2009 was $4.3 million, an increase of 893%.

128.    On the one hand, the present-day market value of Camelot is $960,000. The Atwell Employment Agreement, on the other hand, is worth approximately $50 million over its seven (7) year term. In other words, the agreement is worth over *50 times* the total market value of the entire company today. The sheer size of the payout to Atwell and the value of the agreement, especially when compared to the Company's meager revenues and Atwell's role and domination of the Board, demonstrates that the decision of the Board to enter into the Atwell Employment Agreement was not a proper exercise of its business judgment and that the Board was grossly negligent in approving and ratifying the agreement. No reasonable business person would have made the decision that the Board made under these circumstances.

129.    The size of the payout, the longevity of the contract, Atwell and Istock's role as members of the Compensation Committee, and the lack of any reliance on a compensation expert rebut any presumption that the Board acted in good faith and in the best interest of the Company when it ratified the Atwell Employment Agreement. These facts, in other words, demonstrate that: (i) Atwell and Istock were interested and not independent Directors when the decision was made by the Board to execute the Atwell Employment Agreement; and (ii) the Atwell Employment Agreement was not the product of a valid exercise of business judgment.

130.   At a minimum, these facts raise a reasonable doubt as to whether or not Atwell and Istock were disinterested and independent, and whether or not the agreement was the product of a valid exercise of business judgment. The facts provide a strong reason to believe that the conduct of the Board (that is, Atwell and Istock), constituted a violation of their fiduciary duties. Because the Atwell Employment Agreement is worth approximately $50 million over seven (7) years whereas the Company itself is valued at only $960,000 and has minimal revenues, Atwell's compensation is so disproportionately large, when compared with the services to be received in exchange, as to be unconscionable and irrational.

131.   Camelot and its stockholders have suffered and will continue to suffer harm as a result of the Atwell and Istock's wasteful conduct.

132.   All conditions precedent to this claim have occurred or been fulfilled.

### Derivative and Demand Allegations

133.   Jarowey brings the Second and Third Claims for Relief derivatively, in the right and for the benefit of Camelot, to redress the breaches of fiduciary duty and other violations of law by Defendants Atwell and Istock. Jarowey will adequately and fairly represent the interests of Camelot and its shareholders in enforcing and prosecuting its rights.

134.   Jarowey has not made a demand upon the Board to take remedial action on behalf of Camelot against the Defendants Atwell and Istock because the Board participated in, approved, and permitted the wrongs alleged herein and is not disinterested and lacks sufficient independence to exercise business judgment. The two members of the Board (the individual defendants Atwell and Istock) have significant financial relationships with Camelot and therefore cannot act independently of its management in making determinations concerning

the compensation of management such as the Atwell Employment Agreement and the
Acquisitions.

135.    Jarowey's lack of demand should be excused.  Atwell is Camelot's
President, Chief Executive Officer and Chairman and Istock is the CFO.  Atwell owns a
controlling interest in the Company's voting stock.  Atwell and Istock are the only two members
on the Board and the only two individual defendants.  Atwell is entitled to cast 69% of the votes
in any vote by the Company's shareholders.  By virtue of his stock ownership, voting power and
history with the Company, Atwell controls the actions of the Board and Istock owes his job to
Atwell.  Istock is therefore beholden to Atwell.  Istock also had a personal interest in the
Transactions because the Transactions kept Atwell in power which, in turn, kept Istock in his
position.  The Transactions were motivated by personal interest and they were not an exercise of
a valid business judgment.  There were no disinterested or outside directors on the Board at the
time of the Transactions.

136.    Today, there are still no independent or outside directors on the Board.
On December 13, 2010, Mr. Leo Griffin was elected to serve as an independent director;
however, Mr. Griffin only accepted his election and will only join the Board once the Company
has secured a directors and officers' insurance policy, which has not yet been procured.  Mr.
Griffin, therefore, is serving as a "Special Consultant" to the Board and he does not have the
authority to authorize an action against Atwell and Istock for breach of their fiduciary duties.
Camelot's Board, therefore, is interested as of the time that these derivative claims are being
asserted.  A majority of the Board, therefore, could not have acted independently and without a
disabling interest in responding to any demand.  That is, the members of the Board would have
been incapable, due to their personal interest and domination and control, of objectively

evaluating a demand, had one been made, that the Board assert Camelot's claims that are raised by the Consultants or otherwise remedy the injury to the Company caused by the Transactions.

137.    Both members of the Board are management and both have financial relationships with Camelot that prevent them from acting independently on any decision that affects compensation of management. A majority of the Board, therefore, is not independent and cannot act independently with respect to the claims made in the Second and Third Claims for Relief, and in particular, cannot act independently with respect to decisions made with regard to Atwell's compensation and the aborted Acquisitions. Demand on the board, therefore, would have been futile.

**Fourth Claim for Relief**
**(Breach of Contract Against Camelot by Jarowey, Hollister and Holmes)**

138.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 137 as if fully set forth herein.

139.    Jarowey, Somerset and Camelot entered into the May 24, 2010 Business Consultant Agreement (the "Contract"). Hollister and Holmes are third-party beneficiaries under the Contract.

140.    Jarowey, Somerset, Holmes and Hollister fulfilled their responsibilities under the terms of the Contract.

141.    Camelot unilaterally and materially breached the Contract.

142.    As a direct result of Camelot's material breaches of the Contract, the Plaintiffs have sustained damages in an amount to be determined by the trier of fact.

53

143. All conditions precedent to this claim have occurred or been fulfilled.

### Fifth Claim for Relief
### (Promissory Estoppel Against Camelot by Jarowey, Hollister and Holmes)

144. Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

145. In making the promises detailed above that Camelot would, among other things, compensate Jarowey with Camelot S-8 Shares if the Company did not have the funds to do so, and pay Holmes and Hollister in Class G Preferred Shares valued at $200,000, Atwell at all times was acting as the authorized agent of Camelot.

146. When Atwell made these promises, Atwell reasonably should have expected to induce Plaintiffs to rely on them.

147. Plaintiffs relied to their detriment by incurring out-of-pocket expenses, committing their resources to assist Camelot, and foregoing other business opportunities in order to meet their obligations to Camelot.

148. Plaintiffs' reliance was justified.

149. Injustice can be avoided only through the award of damages to Plaintiffs, in an amount to be proved at trial.

150. All conditions precedent to this claim have occurred or been fulfilled.

**Sixth Claim for Relief**
**(Unjust Enrichment Against Camelot by Jarowey, Hollister and Holmes)**

151.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 150 as if fully set forth herein.

152.    By providing the extensive services described in the previous paragraphs, Plaintiffs conveyed substantial benefits upon Camelot which saved the Company substantial sums and substantially increased the Company's value.

153.    When they conferred these benefits, Plaintiffs had the expectation of payment in the form of, in the case of Jarowey, receiving S-8 Shares in exchange for his labors if the Company did not have the funds to pay him and, in the case of Holmes and Hollister, receiving Camelot Class G Preferred Shares valued at $200,000.

154.    Camelot accepted and retained the substantial benefits that Plaintiffs conferred upon it, but have paid Plaintiffs nothing and have refused to issue, to Jarowey, S-8 Shares and, to Holmes and Hollister, Camelot Class G Preferred Shares valued at $200,000.

155.    It would be inequitable if Camelot was permitted to retain these benefits without paying for the value it received.  Otherwise, Camelot would be unjustly enriched.

156.    Accordingly, Plaintiffs are entitled to an award of money equal to the value of the benefits conferred upon Camelot by them.

157.    All conditions precedent to this claim have occurred or been fulfilled.

**Seventh Claim for Relief**
**(Violation of Section 20(a) of the Securities**
**Exchange Act Against Camelot by Jarowey)**

158.   Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 157 as if fully set forth herein.

159.   As Atwell's employer, Camelot is a person which directly or indirectly controls persons liable for the violations of Rule 10b-5 as alleged in the First Claim for Relief.

160.   As a "controlling person" under Section 20(a) of the Securities Exchange Act, and a culpable participant in these violations, Camelot is jointly and severally liable.

161.   All conditions precedent to this claim have occurred or been fulfilled.

**Eighth Claim for Relief**
**(Violation of Section 20(a) of the Securities**
**Exchange Act Against Atwell by Jarowey)**

162.   Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 161 as if fully set forth herein.

163.   As the President, Chairman of the Board, Chief Executive Officer, and majority shareholder, Atwell, as alleged above, exercises complete control and dominion over the acts of Camelot.  Atwell, therefore, is a person who directly controls persons liable for the violations of Rule 10b-5 as alleged in the First Claim for Relief.

164.   As a "controlling person" under Section 20(a) of the Securities Exchange Act, and a culpable participant in these violations, Atwell is jointly and severally liable.

165.   All conditions precedent to this claim have occurred or been fulfilled.

**Ninth Claim for Relief**
**(Violation of Cal. Corp. Code § 25401**
**Against Atwell and Camelot by Jarowey)**

166.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

167.    The conduct of Atwell and Camelot alleged above violates Section 25401 of the California Securities Laws of 1968 (Cal. Corp. Code § 25401).

168.    As a result, Jarowey is entitled to relief as provided under Cal. Corp. Code §§ 25500 and 25501, including damages in an amount to be proved at trial, interest at the statutory rate, costs, and reasonable attorneys' fees.

169.    All conditions precedent to this claim have occurred or been fulfilled.

**Tenth Claim for Relief**
**(Violation of Cal. Corp. Code**
**§ 25403Against Camelot by Jarowey)**

170.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 169 as if fully set forth herein.

171.    As Atwell's employer, Camelot is a person which directly or indirectly controls persons liable for the violations of Cal. Corp. Code § 25401 as alleged in the Ninth Claim for Relief.

172.    As a "controlling person" under Section 25403 of the California Securities Laws of 1968, and a culpable participant in these violations, Camelot is jointly and severally liable.

173.    All conditions precedent to this claim have occurred or been fulfilled.

### Eleventh Claim for Relief
### (Violation of Cal. Corp. Code
### § 25403 Against Atwell by Jarowey)

174.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 173 as if fully set forth herein.

175.    As the President, Chairman of the Board, Chief Executive Officer, and majority shareholder, Atwell, as alleged above, exercises complete control and dominion over the acts of Camelot.  Atwell, therefore, is a person who directly controls persons liable for the violations of Cal. Corp. Code § 25401 as alleged in the Ninth Claim for Relief.

176.    As a "controlling person" under Section 25403 of the California Securities Laws of 1968, and a culpable participant in these violations, Atwell is jointly and severally liable.

177.    All conditions precedent to this claim have occurred or been fulfilled.

### Twelfth Claim for Relief
### (Fraud By Camelot and Atwell As Asserted By Jarowey)

178.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 177 as if fully set forth herein.

179.    As previously alleged, Atwell, acting on behalf of Camelot, made false statements of material fact regarding Jarowey's right to receive S-8 Shares in exchange for his services if Camelot did not have the funds necessary to pay him.

180.    At the time he made this misrepresentation, Atwell knew that the misrepresentation was false or was aware that he did not know whether it was true or false, but he did not disclose this to Jarowey.

181.    Atwell made the misrepresentation with the intent that Jarowey act in reliance on it, and knew that Jarowey was within the zone of persons who reasonably could be expected to act in reliance on it.

182.    Jarowey relied on the misrepresentation and on the absence of any contrary disclosure regarding the facts misrepresented.

183.    Jarowey's reliance was justified.

184.    As a proximate result of this reasonable reliance, Jarowey suffered damages including, among others:  (i) the profit Jarowey would have received had the S-8 Shares been issued as they should have been at a time when the price of Camelot shares increased significantly and Jarowey had a right to obtain his shares to take advantage of this market change, and (ii) out-of-pocket losses and consequential damages for the loss of other business opportunities in an amount to be proved at trial.

185.    The conduct of Atwell and Camelot in making the misrepresentation was willful, wanton and in disregard of Jarowey's rights, thereby entitling Jarowey to an award of punitive damages.

186.    All conditions precedent to this claim have occurred or been fulfilled.

**Thirteenth Claim for Relief**
**(Breach of Fiduciary Duty Against Atwell by Jarowey)**

187.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 186 as if fully set forth herein.

188.    As majority shareholder, controlling shareholder, and CEO of Camelot, Defendant Atwell held a position of trust and confidence to Camelot and all of the shareholders, and as such owed fiduciary duties to Jarowey, as he is a shareholder of Camelot.

189.    These fiduciary duties included the duty to disclose all material facts.

190.    The representation that Camelot would compensate Jarowey with S-8 Shares if the Company could not pay him in cash is a material fact.  The statement in the May 2010 BCA that Jarowey would be paid in S-8 Shares if the Company could not pay him in cash is a material fact.

191.    With full knowledge that Camelot did not have the requisite number of S-8 Shares to pay Jarowey, and that it did not have the cash equivalent either, Atwell represented to Jarowey that he would be compensated in S-8 Shares for his labors.  Jarowey was misled in that he was not informed that Atwell had no intention at the time of the May 2010 BCA of compensating him in S-8 Shares.  A reasonable shareholder and consultant would have considered this material fact important in making a decision to provide services to the Company.

192.    Atwell's acts and omissions when a duty to disclose was owed caused Jarowey to, among other things, provide services to Camelot.  Had Jarowey known of the omitted material facts he would not have provided services to Camelot and he would have

contracted with others to provide consulting services. Jarowey was defrauded, misled, damaged and denied such opportunity by Atwell's acts and omissions which constituted breach of fiduciary duties.

193. Atwell breached his fiduciary duties when he, among other things, failed to disclose, among others, the material facts alleged elsewhere and incorporated herein by reference, while simultaneously negotiating the procurement of services from Jarowey.

194. Atwell breached his fiduciary duties when he failed to disclose matters above, which would have, among other things, resulted in Jarowey refusing to provide consulting services to Camelot. By failing to disclose the material facts as alleged herein and with the mis-information, dis-information and information failures alleged herein, Atwell breached his fiduciary duties to shareholder Jarowey.

195. Atwell's breach of fiduciary duties caused Jarowey to lose the opportunity to contract for his services elsewhere.

196. Atwell's breach of his fiduciary duties was motivated by greed and his personal financial interests. Atwell's failure to disclose said important, relevant, and material facts economically harmed Jarowey while simultaneously economically benefiting Atwell.

197. Atwell breached his fiduciary duties to Jarowey by acting for his own advantage to the detriment of Jarowey by, among other things: omitting material facts, stating half truths, making affirmative misrepresentations of, among other things, that Camelot would be able pay Jarowey in S-8 Stock while, at the same time, he was fully aware that he had no intention of paying Jarowey in S-8 Stock.

198.   Atwell breached his fiduciary duties by failing to act honestly and fairly with Jarowey, a shareholder to whom he owed fiduciary duties.

199.   Through these and other actions, Atwell breached these fiduciary duties knowingly, willfully and with malice.

200.   Atwell had and has a continuing duty to this day, going beyond the time frame in which these misrepresentations were made, to disclose the material misrepresentations and breaches of fiduciary duty for as long as they went on.  This duty continues to this day.

201.   As a result of Atwell's breaches of these fiduciary duties, Jarowey has suffered damages for which he is entitled to recover compensatory damages and interest in an amount to be proven at trial.

202.   Atwell's conduct was intentional, willful and malicious.  Atwell's conduct posed and succeeded in creating a huge risk of loss to Jarowey, which risk was well known and appreciated by Atwell.  Atwell's misconduct and breaches of fiduciary duty were highly profitable to Atwell.  Atwell is the controlling shareholder of Camelot and Jarowey's services increased the value of Camelot which, in turn, profited Atwell.

203.   As a direct and proximate result of Atwell's actions, or omissions when a duty to disclose was owed, Jarowey was injured and continues to be injured in an amount to be proven at trial including, but not limited to, the profit he would have realized selling Camelot's S-8 Shares at the time they were owed to him.

204.   All conditions precedent to this claim have occurred or been fulfilled.

**Fourteenth Claim for Relief**
**(Breach of Fiduciary Duty Against Atwell by Holmes and Hollister)**

205.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 204 as if fully set forth herein.

206.    As majority and controlling shareholder and CEO of Camelot, Defendant Atwell holds a position of trust and confidence to Camelot and all of its shareholders, and as such he owes fiduciary duties to Holmes and Hollister, as they are shareholders of Camelot or have the contractual right to become shareholders of Camelot, and would have become shareholders of Camelot, had Atwell not breached the May 2010 BCA. Moreover, because Camelot is and has always been maintained by Atwell as a financially failing entity, Atwell also owes fiduciary duties to the creditors of Camelot, and in all events Holmes and Hollister are creditors of Camelot, a corporation that Atwell maintains in a financially failing position.

207.    These fiduciary duties included the duty to disclose all material facts.

208.    The representations that: (i) Camelot would issue to Hollister and Holmes $100,000 each, for a total amount of $200,000 collectively, in Camelot's Class G Preferred Stock as payment in full pursuant to the FAA, and (ii) on or after September 1, 2010, Holmes and Hollister would have the right to convert any or all of their Class G Convertible Preferred Stock into $200,000 in shares of fully paid and nonassessable shares of Common Stock immediately prior to conversion, are material facts.

209.    The statements in the Class G Certificate that: (i) "holders of Class G Convertible Preferred Stock shall have the right to convert any or all of their Class G Convertible Preferred Stock into 50 shares of fully paid and nonassessable shares of Common Stock for each

share of Class G Convertible Preferred Stock held up to a maximum value of $200,000"; (ii)

Camelot would reserve "sufficient shares of Common Stock to provide for the conversion of all

outstanding shares of Class G Convertible Preferred Stock," and (iii) all Common Stock issued

upon conversion would be "validly issued, fully paid and nonassessable," are material facts.

        210.   With full knowledge that the Class G Certificate was illusory in that the

provisions of the certificate were insufficient to deliver the obligated stock, Atwell represented to

Holmes and Hollister that they would be compensated in Class G Preferred Stock having a value

of $100,000 each, and a total of $200,000 collectively. Holmes and Hollister were misled in that

they were not informed that, because of the Class G Certificate, Camelot had made it extremely

difficult, if not absolutely impossible, for Holmes and Hollister, as holders of Class G Preferred

Shares, to acquire Common Shares worth $200,000, because with a maximum of 1 million Class

G Shares, Holmes and Hollister could only obtain 50,000,000 Common Shares which are only

worth $5,000.00 today. A reasonable shareholder and consultant would have considered this

material fact important in making a decision to provide services to the Company.

        211.   Atwell's acts and omissions when a duty to disclose was owed caused

Holmes and Hollister to provide services to Camelot. Had Holmes and Hollister known of the

omitted material facts they would not have provided services to Camelot and would have

contracted with others to provide investment banking services. Holmes and Hollister were

defrauded, misled, damaged and denied such opportunity by Atwell's acts and omissions which

constituted breach of fiduciary duties.

        212.   Atwell breached his fiduciary duties when he, among other things, failed

to disclose, among others, the material facts alleged elsewhere and incorporated herein by

reference, while simultaneously negotiating the procurement of services from Holmes and Hollister through Jarowey.

213.    Atwell breached his fiduciary duties when he failed to disclose matters above, which would have, among other things, resulted in Holmes and Hollister refusing to provide investment banking services to Camelot.  By failing to disclose the material facts as alleged herein and with the mis-information, dis-information and information failures alleged herein, Atwell breached his fiduciary duties to shareholders Holmes and Hollister.

214.    Atwell's breach of fiduciary duties caused Holmes and Hollister to lose the opportunity to contract for their services elsewhere.

215.    Atwell's breach of his fiduciary duties was motivated by greed and his personal financial interests.  Atwell's failure to disclose said important, relevant, and material facts economically harmed Holmes and Hollister while simultaneously economically benefiting Atwell.

216.    Atwell breached his fiduciary duties to Holmes and Hollister by acting for his own advantage to the detriment of Holmes and Hollister by, among other things:  omitting material facts, stating half truths, making affirmative misrepresentations of, among other things, that Camelot would pay Holmes and Hollister with $200,000 worth of Class G Preferred Shares while, at the same time, he was filing with the State of Delaware the Class G Certificate which made it almost impossible for the Company to do that.

217.    Atwell breached his fiduciary duties by failing to act honestly and fairly with Holmes and Hollister, shareholders to whom he owed fiduciary duties.

218.    Through these and other actions, Atwell breached these fiduciary duties knowingly, willfully and with malice.

219.    Atwell had and has a continuing duty to this day, going beyond the time frame in which these misrepresentations were made, to disclose the material misrepresentations and breaches of fiduciary duty for as long as they went on. This duty continues to this day.

220.    As a result of Atwell's breaches of these fiduciary duties, Holmes and Hollister have suffered damages for which they are entitled to recover compensatory damages and interest in an amount to be proven at trial.

221.    Atwell's conduct was intentional, willful and malicious.  Atwell's conduct posed and succeeded in creating a huge risk of loss to Holmes and Hollister, which risk was well known and appreciated by Atwell.  Atwell's misconduct and breaches of fiduciary duty were highly profitable to Atwell.  Atwell is the controlling shareholder of Camelot and Holmes' and Hollister's services increased the value of Camelot which, in turn, profited Atwell.

222.    As a direct and proximate result of Atwell's actions, or omissions when a duty to disclose was owed, Holmes and Hollister were injured and continue to be injured in an amount to be proven at trial.

223.    All conditions precedent to this claim have occurred or been fulfilled.

### Fifteenth Claim for Relief
### (Constructive Fraud Against Atwell by Jarowey, Holmes and Hollister)

224.    Plaintiffs repeat, reallege and incorporate the allegations contained in paragraphs 1 through 223 as if fully set forth herein.

225.    As a member of the Board of Directors, Atwell owed fiduciary duties of care and loyalty and the duty to disclose key, vital, material, and otherwise necessary facts to the Consultants (shareholders and creditors), when Camelot, and Atwell personally, was negotiating the May 2010 BCA.

226.    As a member of the Board of Directors, Atwell was responsible for Camelot's conduct.  Camelot owed a duty to disclose material facts to the shareholder and creditor Consultants.

227.    Atwell failed in his duty to disclose certain material facts to the Consultants, including, but not limited to, the facts that:  (i) Atwell had no intention of compensating Jarowey with S-8 Shares for his labors if the Company did not have the necessary funds to do so; and (ii) the provisions of the Class G Certificate were insufficient to deliver the stock obligated to Holmes and Hollister under the May 2010 BCA.

228.    Atwell's failure to disclose these, and other facts, would affect the conduct of a reasonable person in reference to this, or similar transactions, and these failures to disclose, among other conduct, violates public and private confidence.

229.    As a Director of Camelot, Atwell was in a position of special confidence and trust to the Consultants as shareholders and creditors of Camelot.

230.    Atwell took undue advantage or exercised undue influence over the Consultants by withholding, or failing to disclose, key, vital, material, and otherwise necessary information when there existed a duty to do so.

231.    Atwell used the power inherent in his role as a fiduciary, for personal financial gain.

232.    With full knowledge that he had no intent of compensating Jarowey with S-8 Shares and full knowledge that the provisions of the Class G Certificate were insufficient to deliver the stock obligated to Holmes and Hollister under the May 2010 BCA, Atwell was negotiating the May 2010 BCA. Not knowing the material facts withheld by Atwell, the Consultants were constructively defrauded by omissions and otherwise as they were not provided information that would have affected the total mix of information that a reasonable shareholder would have considered important in making a decision to provide services to Camelot.

233.    Atwell's acts and omissions, when a duty to disclose was owed, caused the Consultants to provide their services to Camelot. Had the Consultants known of the omitted material facts they would not have provided their services to Camelot. The Consultants were defrauded, misled, damaged and denied such opportunity by Atwell's acts and omissions which, because of the special relationship of trust and confidence instilled in Atwell by the Consultants, the acts and omissions as outlined above, and throughout this Complaint, operated a constructive fraud upon the Consultants even if Atwell was being strictly honest and had no intention to defraud.

234.    The circumstances surrounding the May 2010 BCA, in addition to the relationship of the parties, induced the Consultants' reliance on Atwell's failures to disclose key, vital, material, and otherwise necessary facts to the Consultants and the Consultants, in fact, justifiably relied on Atwell's omissions. Or, put another way, Atwell's inequitable conduct, whether or not accompanied by affirmative false representations, operated to defraud, deceive,

mislead and damage the Consultants.  The Consultants are also entitled to a presumption of reliance on omitted information.

235.    As a direct and proximate result of Atwell's actions, or omissions when a duty to disclose was owed, the Consultants were injured and continue to be injured in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs and against Defendants and provide the following relief:

(a)    Awarding Plaintiffs compensatory damages in an amount to be determined by the trier of fact;

(b)    Awarding Plaintiffs punitive damages in an amount to be determined by the trier of fact;

(c)    Awarding Plaintiffs their court costs, expenses and reasonable attorney's fees;

(d)    Awarding Plaintiffs prejudgment and postjudgment interest at the highest rate(s) provided by law; and,

(e)    Granting Plaintiffs such other and further relief, at law and in equity, as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial in this action for all the claims so triable.

Dated:  April 15, 2011
New York, New York

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By:
Marc E. Kasowitz
David J. Shapiro

1633 Broadway
New York, New York 10019
(212) 506-1700 (Telephone)
(212) 506-1800 (Facsimile)
mkasowitz@kasowitz.com
dshapiro@kasowitz.com

Attorneys for Plaintiffs Peter M. Jarowey II and
Somerset Group, LLC

JOSEPH D. CARNEY & ASSOCIATES, L.L.C.
ATTORNEYS AT LAW

Joseph D. Carney (0010886)
2001 Crocker Road, Suite 530
Westlake, Ohio  44145
(440) 249-0850 (Telephone)
(866) 270-1221 (Facsimile)
jdc@jdcarney.com

Attorneys for Plaintiffs John
B. Hollister III and Douglas Q. Holmes