UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

PETER M. JAROWEY II, SOMERSET GROUP, LLC, : 
JOHN B. HOLLISTER III, and DOUGLAS Q. HOLMES, :

Peter M. Jarowey II, John B. Hollister III and Douglas Q. :
Holmes Individually and Peter M. Jarowey II Derivatively :
on Behalf of Camelot Entertainment Group, Inc., for the :
Second and Third Claims for Relief, :

                   :     Civil Action No. 11-Civ-2611

         Plaintiffs, :

      -against- :

CAMELOT ENTERTAINMENT GROUP, INC., :
ROBERT P. ATWELL and STEVEN V. ISTOCK, :

         Defendants. :

------------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

        Defendants Camelot Entertainment Group, Inc., ("Camelot" or the "Company"), Robert

P. Atwell ("Atwell"), and Steven V. Istock ("Istock") (collectively, the "Defendants"), by and

through their attorneys SNR Denton US LLP, respectfully submit this memorandum of law in

support of their motion to enforce the settlement reached with Plaintiffs Peter M. Jarowey II

("Jarowey"), Somerset Group, LLC ("Somerset"), John B. Hollister III ("Hollister"), and Doug

Q. Holmes ("Holmes"), during the August 31, 2011 mediation conducted by the Honorable

James C. Francis, United States Magistrate Judge for the Southern District of New York.

Submitted herewith is the Declaration of Jonathan E. Goldberg, Esq., dated March 23, 2012

(with exhibits).

## Preliminary Statement

On August 31, 2011, all of the Parties and their counsel appeared by consent before the Honorable James C. Francis, United States Magistrate Judge, for a settlement conference.  After spending the entire day—from approximately 10 am to 7 pm—negotiating the material terms and structure of a settlement, with Judge Francis serving as the mediator and conducting round after round of shuttle diplomacy, a settlement agreement on all material terms was reached.  Before the Parties and counsel shook hands, thanked Judge Francis, and left the courthouse to celebrate, the terms of the settlement were repeated several times in front of the Judge, his law clerks, counsel for the Parties, and the Parties themselves.

Contemporaneous documents (not to mention memory) of the conference reflect the following terms of the settlement:

> (1) Camelot to issue six notes to Peter Jarowey for $100K each, dated as of 12 months ago in 2010 and maturity dates of 12 months successively, 5% interest accrued on the outstanding balance;
>
> (2) Each note to be backed by a separate judgment that will be held in escrow in the event of a default, with a 75 day grace period;
>
> (3) The Parties to work together to sell the Jarowey notes to third parties who purchase debt;
>
> (4) Camelot to provide indemnification of Peter Jarowey in the Utah Incentive case and representation of him by Jonathan Levitan;
>
> (5) Camelot to correct the Series G preferred shares previously issued to John Holmes and Doug Hollister so that they will have $100K each in shares (they can look to the Company for redemption of 1/3 of the amount each year for 3 years if third party does not purchase from them); and
>
> (6) The Plaintiffs to provide the Defendants with complete releases in the New York Litigation and the Utah Litigation.

On January 25, 2012—following months involving, among other things, the exchange of

settlement papers and additional communications between and among counsel and their clients, and after the Court had granted several requests for extensions of time to reinstate the case in the event the settlement papers could not be finalized—the Defendants provided the Plaintiffs with a set of final settlement papers that reflected, among other things, the agreements reached by the Parties on August 31, 2011 (the "1/25/12 Settlement Papers"). However, rather than execute the 1/25/12 Settlement Papers—or even provide comments to those documents—the Plaintiffs refused to execute those papers and, on January 31, 2012, wrote a letter to the Court purporting to "reinstate" the case.

This Court has the power to, and respectfully should, enforce summarily the settlement agreement reached on August 31, 2011 as reflected in the settlement papers sent by the Defendants to the Plaintiffs on January 25, 2012. That the Parties settled their dispute under the terms reached on August 31—and that such settlement is enforceable—is confirmed by the irrefutable fact that the Parties already performed certain aspects of the August 31 settlement. As part of the settlement, Camelot had agreed to indemnify and represent Jarowey in a federal court litigation then pending in Utah (the "Utah Litigation"). In accordance with the August 31 settlement, Camelot provided that representation and settled the Utah litigation on behalf of Jarowey. In accordance with the August 31 settlement, Jarowey was not required to, nor did he, reimburse Camelot for the legal fees and costs incurred on his behalf. Nor was Jarowey required to make any financial or other contribution towards the settlement of the Utah Litigation. As a result of the settlement of the present litigation on August 31, 2011, Jarowey received a complete release from all of the parties in the Utah Litigation and the case against him was dismissed with prejudice.

As the Plaintiffs have admitted, "agreements [were] reached at the mediation." Letter

from David Shapiro, counsel for Plaintiffs Jarowey and Somerset, dated January 30, 2012. The Defendants agree. Both law and equity support the swift enforcement of those agreements and the dismissal of this action against the Defendants *with prejudice*.

## FACTS

Camelot and Jarowey entered into a Financial Advisor Agreement dated August 11, 2009, a Business Consulting Agreement dated February 1, 2010, and a Business Consultant Agreement dated May 24, 2010 (the last of these three agreements is referred to herein as the "BCA," all three agreements are referred to herein collectively as the "Agreements"). Goldberg Decl., Exh. 1 (Settlement Papers, dated January 25, 2012), Subpart A (Settlement Agreement and Release), at pp. 1-3 ("Recitals")).[1] On September 17, 2012, the Corporation terminated the Agreement. Id.

On April 15, 2011, the Consultants filed a complaint (the "Complaint") against the Camelot Parties in the United States District Court for the Southern District of New York, styled *Peter M. Jarowey, II, et al. v. Camelot Entertainment Group, et al.*, 11-CV-1096 (S.D.N.Y. Holwell, J.) (the "New York Litigation") in connection with the Agreements alleging, among other things, breach of the BCA, violation of federal and state securities laws, and derivative claims, on behalf of the Corporation, for breach of fiduciary duty and corporate waste. Id. *See also* Complaint (Docket No. 1). (At that time, both the Company and Jarowey (and others) were named as defendants in a litigation filed in the United States District Court for the District of Utah, styled *Incentive Capital, LLC v. Camelot Entertainment Group, et al.*, 11-CV-00288 (D. Utah, Waddoups J.) (the "Utah Litigation")). *See* Goldberg Decl., Exh. 1, Subpart A, at pp. 1-3 (Recitals).

---

[1] The language contained in the Recitals section of the Settlement Agreement and Release was either drafted by the Plaintiffs' counsel or not disputed by them.

On June 20, 2011, the Defendants sent a letter to the Court requesting permission to file a motion to dismiss the Complaint. Goldberg Decl., Exh. 2. Over the Plaintiffs' objections, the Court granted the Defendants permission to file a motion to dismiss. *See* Docket No. 11 (Scheduling Order setting forth Judge Holwell's briefing schedule on the Defendants' motion to dismiss).

Shortly thereafter, on August 31, 2011, the Parties participated in a settlement conference before the Honorable James C. Francis, United States Magistrate Judge for the Southern District of New York, and reached a settlement of the New York Litigation. Goldberg Decl., ¶ 6.

After spending nearly 8 hours negotiating the material terms and structure of a settlement, with Judge Francis serving as the mediator and conducting numerous rounds of shuttle diplomacy, a binding agreement was reached. Id. Before the Parties and counsel shook hands, thanked Judge Francis, and left the courthouse to celebrate, the terms of the settlement were repeated several times in front of the Judge, his law clerks, counsel for the Parties, and the Parties themselves. Id. The material terms of the settlement were as follows:

> (1) Camelot will issue six notes to Peter Jarowey for $100K each, dated as of 12 months ago in 2010 and maturity dates of 12 months successively, 5% interest accrued on the outstanding balance;
>
> (2) Each note to be backed by a separate judgment that will be held in escrow in the event of a default, with a 75 day grace period;
>
> (3) The Parties will work together to sell the Jarowey notes to third parties who purchase debt;
>
> (4) Camelot to provide indemnification of Peter Jarowey in the Utah Incentive case and representation of him by Jonathan Levitan;
>
> (5) Camelot to correct the Series G preferred shares previously issued to John Holmes and Doug Hollister so that they will have $100K each in shares (they can look to the Company for redemption of 1/3 of the amount each year for 3 years if third party

does not purchase from them); and

(6) The Plaintiffs to provide the Defendants with complete releases
in the New York Litigation and the Utah Litigation.

Id., Exh. 3 (contemporaneous documents showing the material terms of the settlement).

On January 25, 2012—following months involving, among other things, the exchange of

settlement papers and additional communications between and among counsel and their clients,

and after the Court had granted several requests for extensions of time to reinstate the case in the

event the settlement papers could not be finalized—the Defendants provided the Plaintiffs with a

set of final settlement papers that reflected, among other things, the agreements reached by the

Parties on August 31, 2011 (the "1/25/12 Settlement Papers," attached to the Goldberg Decl. as

Exh. 1).

Indeed, as shown in detail below—and as shown in the exhibits submitted herewith—it is

clear that the settlement papers sent to the Plaintiffs on January 25, 2012 reflect the agreements

between the Parties reached on August 31, 2011:

(1)      **Material Term/Agreement No. 1:**  Camelot will issue six notes to Peter Jarowey for
$100,000 each, dated as of 12 months ago in 2010 and maturity dates of 12 months
successively, 5% interest accrued on the outstanding balance.

**The 1/25/12 Settlement Papers Reflect Material Term/Agreement No. 1:**

Section 5(a) of the Agreement and Release, sent to Plaintiffs on January 25, 2012,

provides as follows:

5.      Consideration.  Upon full execution of this Settlement
Agreement, the Parties shall take the following actions:

a.      **The Corporation Shall Issue to Jarowey six (6)
Convertible Notes in the Amount of One Hundred Thousand
Dollars ($100,000) Each**.

**Contemporaneous with the execution of this Settlement
Agreement, the Corporation shall issue to Jarowey six (6)**

6

**convertible notes in the amount of one hundred thousand dollars ($100,000) each payable to the holder thereof ("Holder") on the maturity date, copies of which are attached hereto as Exhibit B (the "Notes"). The Parties acknowledge that $300,000 of the amounts payable under the Notes were earned before October 1, 2010, and that the balance of the Notes, $300,000, are deemed earned as of the effective date of this Agreement.**

Each Note is secured by a separate Judgment (the "Judgment") to be held in escrow in the event of an uncured event of default of the Note. Copies of a document entitled "Agreed Facts and Question Submitted for Determination," dated January 27, 2012, the Declaration of Robert P. Atwell, the CEO of Camelot, in Support of An Agreed Case, dated January 27, 2012 ("Atwell Declaration"), the Declaration of Matthew Wolf, Esq., in Support of An Agreed Case, dated January 27, 2012 ("Wolf Declaration"), and the Judgment in An Agreed Case ("Judgment") (collectively, the "Agreed Case Judgment Papers"), are attached hereto as Exhibits C, D, E, and F. However, pursuant to the terms of each Note, in the event of a default, the Corporation shall have a grace period of seventy-five (75) days to cure the default. **The Notes shall bear interest at 5% per annum, compounded annually**, but during any Event of Default shall bear interest at 1.5% per month, compounded monthly (the "Default Interest Rate"). Interest shall be payable monthly on the 1st business day of each month after any Event of Default continuing until the Notes are fully repaid.

*See* Goldberg Decl., Exh. 1 Subpart A (Settlement Agreement and Release), §5(a) (emphasis in bold added); *see also* Goldberg Decl., Exh. 1, Subpart B (Form of Convertible Note), at p. 1 (reflecting a maturity date with respect to the first note of January 31, 2013 (i.e., 12 months from execution of the Settlement Agreement and Release at the end of January 2012), and 5% interest).

**(2)**   **Material Term/Agreement No. 2:**  Each note to be backed by a separate judgment that will be held in escrow in the event of a default, with a 75 day grace period.

**The 1/25/12 Settlement Papers Reflect Material Term/Agreement No. 2:**

Section 5(a) of the Agreement and Release, sent to Plaintiffs on January 25, 2012, also

states clearly that each note is backed by a separate judgment held in escrow with a 75 day grace period:

> 5.   <u>Consideration</u>.  Upon full execution of this Settlement Agreement, the Parties shall take the following actions:
>
>    a.   <u>The Corporation Shall Issue to Jarowey six (6) Convertible Notes in the Amount of One Hundred Thousand Dollars ($100,000) Each</u>.
>
>    Contemporaneous with the execution of this Settlement Agreement, the Corporation shall issue to Jarowey six (6) convertible notes in the amount of one hundred thousand dollars ($100,000) each payable to the holder thereof ("Holder") on the maturity date, copies of which are attached hereto as Exhibit B (the "Notes").  The Parties acknowledge that $300,000 of the amounts payable under the Notes were earned before October 1, 2010, and that the balance of the Notes, $300,000, are deemed earned as of the effective date of this Agreement.
>
>    **Each Note is secured by a separate Judgment (the "Judgment") to be held in escrow in the event of an uncured event of default of the Note.  Copies of a document entitled "Agreed Facts and Question Submitted for Determination," dated January 27, 2012, the Declaration of Robert P. Atwell, the CEO of Camelot, in Support of An Agreed Case, dated January 27, 2012 ("Atwell Declaration"), the Declaration of Matthew Wolf, Esq., in Support of An Agreed Case, dated January 27, 2012 ("Wolf Declaration"), and the Judgment in An Agreed Case ("Judgment") (collectively, the "Agreed Case Judgment Papers"), are attached hereto as Exhibits C, D, E, and F.  However, pursuant to the terms of each Note, in the event of a default, the Corporation shall have a grace period of seventy-five (75) days to cure the default.** The Notes shall bear interest at 5% per annum, compounded annually, but during any Event of Default shall bear interest at 1.5% per month, compounded monthly (the "Default Interest Rate").  Interest shall be payable monthly on the 1st business day of each month after any Event of Default continuing until the Notes are fully repaid.

*See* Goldberg Decl., Exh. 1, Subpart A (Settlement Agreement and Release), §5(a) (emphasis in bold added); *see also* Id., Subpart D (Escrow Agreement); Subpart E (Judgment in An Agreed Case); Subpart F (Declaration of Robert P. Atwell, the CEO of Camelot, in Support of An

Agreed Case, dated January 27, 2012 ("Atwell Declaration"); Subpart G (the Declaration of

Matthew Wolf, Esq., in Support of An Agreed Case, dated January 27, 2012) ("Wolf

Declaration"), Id., Subpart H (Agreed Facts and Question Submitted for Determination, dated

January 27, 2012).

**(3)**     **Material Term/Agreement No. 3:**  The Parties will work together to sell the Jarowey
notes to third parties who purchase debt.

> **The 1/25/12 Settlement Papers Reflect Material Term/Agreement No. 3:**

Section 5(a) of the Agreement and Release, sent to Plaintiffs on January 25, 2012,

provides in pertinent part that:

> > The Holder of any of the Notes, which initially shall be Jarowey,
> > may sell, transfer, assign, hypotheticate, pledge and in all manners
> > transact in the Notes.  **Camelot shall from the time of issuance of
> > the Notes seek to find buyers for the Notes, and Camelot shall
> > inform the Holder of the Notes of any person or entity who is a
> > bona fide purchaser of the Notes for their face value.  Holder
> > shall have the option to either sell the Note(s) to such
> > purchasers or to convert the note for Holders' own account on
> > or before Holder is informed by Camelot of any person or
> > entity who is a bona fide purchaser of the Notes for their face
> > value.**  However, notwithstanding the right of a Holder to transact
> > in the Notes, pursuant to the express terms of the Notes, the Holder
> > shall be entitled to repayment in full on the stated maturity date by
> > the Corporation of the face value of each Note ($100,000), plus
> > interest.

*See* Goldberg Decl., Exh. 1, Subpart A (Settlement Agreement and Release), §5(a) (emphasis in

bold added).

**(4)**     **Material Term/Agreement No. 4:**  Camelot to provide indemnification of Peter
Jarowey in the Utah Incentive case and representation of him by Camelot's counsel,
attorney Jonathan Levitan.

> **Camelot Has Already Performed Material Term/Agreement No. 4:**

The Settlement Agreement sent to Plaintiffs on January 25, 2012 recognizes that the

Defendants had already performed in connection with this Material Term/Agreement reached on

August 31, 2011, providing in the recitals section as follows:

> WHEREAS, both the Corporation and Jarowey (and others) were named as defendants in a litigation filed in the United States District Court for the District of Utah, styled *Incentive Capital, LLC v. Camelot Entertainment Group, et al.*, 11-CV-00288 (D. Utah, Waddoups J.) (the "Utah Litigation"); and

> WHEREAS, on August 31, 2011, the Parties participated in a settlement conference before the Honorable Magistrate Judge Francis and reached a settlement of the New York Litigation (which included, as one of its terms, representation by Camelot of Jarowey in the Utah Litigation); and

> WHEREAS, the Utah Litigation was recently settled and dismissed with prejudice . . . .

*See* Goldberg Decl., Subpart A (Settlement Agreement and Release), at pp. 1-3 (Recitals).

Indeed, the Settlement Agreement in the Utah Litigation, entered into as of the 12th day of October, 2011, reflects the fact that Camelot took over Jarowey's defense and that Camelot settled the litigation on his behalf without requiring him to contribute anything towards the settlement. *See* Goldberg Decl., Exh. 4 (Settlement Agreement and Release in Utah Litigation), at p. 1 (defining Peter Jarowey as one of the "Individuals" named as a defendant in the litigation), p. 25 (reflecting that notice to the "Individuals" is to be sent to "The Atwell Group, Inc." to the attention of Robert B .Atwell with a copy to attorney Jonathan M. Levitan); Id. at §3 ("Consideration") (stating that "Camelot shall have the sole responsibility for, and shall take, the following actions . . . ."). In addition to signing the agreement (Id. at p. 29), Mr. Jarowey initialed every single page. Id. (*passim*). Per the agreement, the Utah Litigation was dismissed with prejudice. Id. at ¶ 37 ("Dismissal of the California and Utah Litigation Action with Prejudice").

Accordingly, the Defendants performed this material term and Plaintiff Jarowey received the full benefit of this bargained for contractual performance.

**(5)**   **Material Term/Agreement No. 5:**  Camelot to correct the Series G preferred shares previously issued to Holmes and Hollister so that John Holmes and Doug Hollister will have $100K each in shares (they can look to the Company for redemption of 1/3 of the amount  (they can look to the Company for redemption of 1/3 of the amount each year for 3 years if third party does not purchase from them).

**The 1/25/12 Settlement Papers Reflect Material Term/Agreement No. 5:**

Section 5(d)(1) of the Agreement and Release sent to Plaintiffs on January 25, 2012

provides as follows:

(d)   Amending the Series G Preferred Shares.

**(1)   The Corporation will adopt an "Amended and Restated Certificate of Designation of the Class G Convertible Preferred Stock," file same with the State of Delaware, and issue certificates for Series G Convertible Preferred Shares which accurately reflect that Hollister and Holmes each possesses one hundred thousand dollars ($100,000) in Series G Convertible Preferred Shares (the "Series G Amendment," a copy of which is attached hereto as Exhibit G).** The Amended and Restated Certificate of Designation of the Class G Convertible Preferred Stock shall be acted on and filed with the State of Delaware by the Corporation within 20 business days of this Agreement. **Hollister and Holmes shall have an affirmative duty to either convert their Series G Preferred Shares into common stock and/or attempt to sell their shares and Camelot will assist in those efforts. In the event that Holmes and Hollister are unable to sell one third of the one hundred thousand dollars ($100,000) in Series G Preferred Shares ($33,333.33) by February 1, 2013, they shall be entitled to redemption by the Corporation in the form of common stock (or cash if available) of one third of the one hundred thousand dollars ($100,000) in Series G Preferred Shares ($33,333.33). Thereafter, in the event that Holmes and Hollister are unable to sell the second third of the one hundred thousand dollars ($100,000) in Series G Preferred Shares ($33,333.33) by February 1, 2014, they shall be entitled to redemption by the Corporation in the form of common stock (or cash if available) of the second third of the one hundred thousand dollars ($100,000) in Series G Preferred Shares ($33,333.33). Thereafter, in the event that Holmes and Hollister are unable to sell the final third of the one hundred thousand dollars ($100,000) in Series G Preferred Shares ($33,333.34) by February 1, 2015, they shall be entitled to redemption by the**

11

> **Corporation in the form of common stock or cash (if available)
> of the final third of the one hundred thousand dollars
> ($100,000) in Series G Preferred Shares ($33,333.34).** Such
> redemption rights are saleable, assignable, transferable, and any
> such transactions in the Series G Preferred Shares will not void this
> right to redemption by the Holder of such Series G Stock. In the
> event that either Hollister and/or Holmes sell, assign, transfer,
> convey or encumber any Series G Stock, or any part thereof,
> Hollister and/or Holmes will provide notice to the Company,
> which will confirm the outstanding amount of the Series G Stock
> to be sold, assigned, transferred, conveyed or encumbered.
> Hollister and/or Holmes agree not to sell, assign, transfer, convey
> or encumber any Series G Stock that has been partially converted
> to Shares without disclosing to the buyer that a portion of the
> original amount of Series G Stock is no longer outstanding.

*See* Goldberg Decl., Exh. 1, Subpart A (Settlement Agreement and Release), at §5(d)(1)

(emphasis in bold added); *see also* Id., Exh. 1, Subpart C (Amended and Restated Certificate of

Designation of the Class G Convertible Preferred Stock).

(6)    **Material Term/Agreement No. 6:**  The Plaintiffs to provide the Defendants with
complete releases in the New York Litigation and the Utah Litigation.

> **Plaintiff Jarowey Has Already Partially Performed Material Term/Agreement No. 6
> (by Providing Camelot with a Complete Release in the Utah Litigation) and the
> 1/25/12 Settlement Papers Reflect the Remaining Portion of Material
> <u>Term/Agreement No. 6 (containing a Complete Release in the New York Litigation):</u>**

By letter agreement dated November 2011, Plaintiff Peter Jarowey provided Camelot

with a complete release in the Utah Litigation. *See* Goldberg Decl., Exh. 5 (November 2011

Agreement between Jarowey and Camelot).

Further, Section 10 of the Settlement Agreement and Release sent to Plaintiffs on January

25, 2012 contains a complete release from the Plaintiffs to the Defendants in the New York

Litigation:

> 10.    Release of Claims by the Consultants.
>
> a.    Except for the Corporation's obligations created
> under this Settlement Agreement, the Consultants, on behalf of

themselves, their agents, shareholders, officers, directors, associates, representatives, employees, attorneys, joint venturers, affiliates, general and limited partners, parent and subsidiary investors, attorneys, accountants, relatives, associates, contractors, affiliates, successors and assigns, and all persons acting by, through, under or in concert with any of them (collectively referred to as the "the Consultant Parties Affiliates"), hereby irrevocably and forever release, acquit and discharge Camelot and the "Camelot Affiliates," and each of them, and all persons acting by, through, under or in concert with any of them, from any and all claims, charges, complaints, injuries, liabilities, obligations, losses, debts, suits, demands, grievances, costs, expenses (including, but not limited to, reasonable attorneys' fees, reasonable receiver fees, reasonable accountant fees, and other reasonable, professional and expert fees), rights, actions and causes of action, of any nature or manner whatsoever, known and unknown, suspected and unsuspected, contingent or fixed, liquidated or unliquidated, past, present or future, including, but not limited to, rights arising because of any act of omission or commission, alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, any tort, or any federal, state or other governmental statute, regulation, law or ordinance from the beginning of time to the date of execution of this Settlement Agreement, which the Consultants may have as to Camelot and the "Camelot Affiliates," or any of them, and all persons acting by, through, under or in concert with any of them, relating to the services contracted for and/or provided by the Consultants to the Corporation, the New York Litigation, the Utah Litigation, and/or any other related matters.

Notwithstanding anything to the contrary contained herein, the Consultants do not release any counterclaims or defenses against any entities/persons other than Camelot and the "Camelot Affiliates." The foregoing release also does not release, waive or give up the Consultants' right to enforce the terms of this Settlement Agreement.

b.      The Parties understand that there is a risk that, subsequent to the execution and delivery of this Settlement Agreement, losses, damages or injuries might be incurred which are unknown or unanticipated, for whatever reason, at the time of the execution and delivery of this Settlement Agreement. It is nonetheless specifically agreed that, upon full execution of this Settlement Agreement, the releases specified in Section 10(a) of this Settlement Agreement are completely effective regardless of any present lack of knowledge on the part of any Party as to any

claims, charges, complaints, liabilities, obligations, debts, suits, demands, grievances, losses, damages, injuries, costs, expenses, rights, actions or causes of action, or as to any possible fact or circumstance relating in any manner to the matters for which the releases specified in this Settlement Agreement are made. The Consultants, for themselves and the Consultant Affiliates, voluntarily, intentionally and expressly waive the benefits and provisions of any law of any state or territory of the United States of America or other jurisdiction similar to Section 1542 of the Civil Code of the State of California, which provides that:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

c.      Upon execution of this Agreement, the Consultants, on behalf of themselves, their agents, shareholders, officers, directors, relatives, associates, representatives, employees, attorneys, joint venturers, affiliates, general and limited partners, parent and subsidiary investors, attorneys, accountants, contractors, affiliates, successors and assigns, and all persons acting by, through, under or in concert with any of them (collectively referred to as the "the Consultant Parties Affiliates"), hereby irrevocably and forever release, acquit and discharge the Individuals and the "Individual Affiliates" (excluding Camelot and the Camelot Affiliates, other than the Individuals), and each of them, and all persons acting by, through, under or in concert with any of them, from any and all claims, charges, complaints, injuries, liabilities, obligations, losses, debts, suits, demands, grievances, costs, expenses (including, but not limited to, reasonable attorneys' fees, reasonable receiver fees, reasonable accountant fees, and other reasonable, professional and expert fees), rights, actions and causes of action, of any nature or manner whatsoever, known and unknown, suspected and unsuspected, contingent or fixed, liquidated or unliquidated, past, present or future, including, but not limited to, rights arising because of any act of omission or commission, alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, any tort, or any federal, state or other governmental statute, regulation, law or ordinance from the beginning of time to the date of execution of this Settlement Agreement, which the Consultants may have as to the Individuals and the "Individual Affiliates" (excluding Camelot and the Camelot Affiliates, other

14

than the Individuals), or any of them, and all persons acting by, through, under or in concert with any of them, relating to the services contracted for and/or provided by the Consultants to the Corporation, the New York Litigation, the Utah Litigation, and/or any other related matters.

Notwithstanding anything to the contrary contained herein, the Consultants do not release any counterclaims or defenses against any entities/persons other than the Individuals and the "Individual Affiliates" (excluding Camelot and the Camelot Affiliates, other than the Individuals).

d.     The Parties understand that there is a risk that, subsequent to the execution and delivery of this Settlement Agreement, losses, damages or injuries might be incurred which are unknown or unanticipated, for whatever reason, at the time of the execution and delivery of this Settlement Agreement. It is nonetheless specifically agreed that the releases specified in Section 10(c) of this Settlement Agreement are effective upon the full execution of this Settlement Agreement, regardless of any present lack of knowledge on the part of any Party as to any claims, charges, complaints, liabilities, obligations, debts, suits, demands, grievances, losses, damages, injuries, costs, expenses, rights, actions or causes of action, or as to any possible fact or circumstance relating in any manner  to the matters for which the releases specified in this Settlement Agreement are made.  Upon the full execution of this Settlement Agreement, the Consultants, for themselves and the Consultant Affiliates, voluntarily, intentionally and expressly waive the benefits and provisions of any law of any state or territory of the United States of America or other jurisdiction similar to Section 1542 of the Civil Code of the State of California, which provides that:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

*See* Goldberg Decl., Exh. 1, Subpart A (Settlement Agreement and Release), at §10.

\*        \*        \*        \*

As shown above, each of the material terms of the settlement reached on August 31 are

either reflected in the 1/25/12 Settlement Papers or, in the case of the matters involving the Utah Litigation, have already been performed by the Parties.

However, rather than execute the 1/25/12 Settlement Papers, the Plaintiffs refused to execute those papers and, on January 30, 2012, wrote a letter to the Court purporting to "reinstate" the case (Goldberg Decl., Exh. 6).[2]  The Defendants responded to that letter on February 1, 2012, objecting to various statements made by Plaintiffs' counsel and referencing this motion to enforce the settlement.  Goldberg Decl., Exh. 7.  On February 28, 2012, the Parties and their counsel appeared again before Judge Francis to discuss this matter.  Following that conference, and following additional communications between counsel, the Defendants were forced to file this motion to enforce the settlement.  Goldberg Decl., ¶13.

## ARGUMENT

"Settlement is generally viewed as a 'positive force, indispensable to judicial administration;' a 'settlement is a contract, and once entered into is binding and conclusive.'" *Cruz v. Korean Air Lines Co.*, 839 F. Supp. 843 (S.D.N.Y. 1993) (citations omitted) (finding that a valid and enforceable settlement was reached).  Further, it is well established that a district court has the power and duty to enforce summarily, on motion, a settlement agreement reached in a case then pending before it.  *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974); *Cruz*, 838 F. Supp. at 845-46.

In the present case, the Parties entered into a binding settlement agreement on August 31, 2011.  After a full day of mediation before Judge Francis, all of the material terms were negotiated and agreed upon by the Parties and their counsel.  Those material terms were repeated

---

[2] In their letter to the Court dated January 30, 2012, the Plaintiffs attempted to use the agreement between Camelot and JSJ as an excuse for not executing the 1/25/12 Settlement Papers.  The Defendants believe, among other things, that the Plaintiffs' argument is a baseless smokescreen and will address the matter further in their reply brief if necessary.

a number of times before Judge Francis, his law clerks, the Parties and their counsel, and contemporaneous notes of those terms were taken. "Parties may enter into a binding contract orally, and the intention to commit an agreement to writing, standing alone, will not prevent contract formation." *Powell v. Omnicom, BBDO/PHD*, 497 F.3d 124, 129 (2d Cir. 2007). Indeed, oral settlement agreements are enforceable when made during unrecorded settlement meetings before the Court. *See Monaghan v. SZS 33 Associates, L.P.*, 73 F.3d 1276, 1282-83 (2d Cir. 1996) (affirming district court's enforcement of an unrecorded oral settlement agreement). In fact, the Second Circuit has created a four factor test to "determine whether parties, who orally agree to settle a matter but fail to fully execute documents to that end, intend to be bound by those oral representations." *Vacco v. Harrah's Operating Co.*, 661 F. Supp. 2d 186, 199 (N.D.N.Y. 2009) (finding enforceable oral settlement agreement notwithstanding that the oral settlement agreement was not on the record and parties could not reach final agreement on final settlement documents).

Consideration of the four factor test demonstrates that the Parties, although contemplating a later writing, intended to be bound from the moment they left the courthouse on August 31st. Those four factors are:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing;
>
> (2) whether there has been partial performance of the contract;
>
> (3) whether all of the terms of the alleged contract have been agreed upon; and
>
> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Powell*, 497 F.3d at 129.

"No single factor is decisive, but each provides significant guidance." *Id.* (finding an enforceable oral settlement agreement based on three of the four factors).

Here, no party expressly reserved the right not to be bound in the absence of a writing. The first factor, therefore, weighs in favor of enforcement of the oral settlement agreement. Likewise, enforcement is favored because there has been partial performance. In both *Vacco*, 661 F. Supp. 2d at 201, as well as the district court decision in *Monaghan*, 875 F. Supp. 1037, 1042 (S.D.N.Y. 1995), the courts found that one party to the oral settlement agreement had benefited from litigation decisions made by the other party. In the present case, pursuant to the terms agreed to on August 31 (Material Term/Agreement No. 4), Camelot undertook the defense of Plaintiff Peter Jarowey in the Utah Litigation and successfully resolved that matter on his behalf, leading to a dismissal of that case with prejudice with no liability to him whatsoever. Moreover, pursuant to Material Term/Agreement No. 6, the Parties provided each other with complete releases in connection with the Utah Litigation. Thus, as in *Vacco* and *Monahan*, the Defendants here are seeking to enforce an oral settlement agreement already partially performed and from which the Plaintiffs have already benefited. *See Managhan*, 73 F.3d at 1283.

With respect to the third factor, the court in *Powell* makes clear that it is the "material" terms of the oral settlement agreement upon which the Parties must have agreed. 497 F.3d at 124. That one party "later took issue with some of the language in the draft agreement" was not enough to make the oral settlement agreement unenforceable. *Id.* Similarly, in *Vacco*, the court found that "[t]he evidence fails to indicate that there were any unresolved *material* terms to the settlement agreement, as opposed to issues that 'are relevant to the performance of the settlement rather assent to its terms.'" 661 F. Supp. 2d at 202 (emphasis in the original). Thus, this factor also weighs in favor of enforcing the oral settlement agreement reached here, where there can be

no dispute regarding what was agreed upon on August 31 and where those agreements concerned the material terms.

With respect to the fourth factor, as the court suggested in *Vacco*, although settlement agreements may be thought of generally as contracts most likely to be in writing, it "would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written." *Id.* at 204-05 (quoting *Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC*, 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005)). Thus, as in *Monaghan* and *Vacco,* that the Parties carefully recited their agreement before Judge Francis and proceeded to act in accordance with the settlement, including by refraining from engaging in further litigation in this case and by settling the Utah Litigation on behalf of Jarowey, suggests that this factor does not weigh against enforcing the settlement here.

Indeed, the Plaintiffs should be estopped from denying the settlement because of the partial performance already rendered. *See Monaghan*, 875 F. Supp. at 1042 ("a court will enforce an oral stipulation if the party who seeks enforcement shows that he or she acted in good faith in reliance upon that stipulation."); *see also Vacco*, 661 F. Supp. 2d at 201-02 (holding that "partial performance on reliance on the settlement agreement" weighs in favor of finding a binding agreement). In reliance on the August 31 settlement, the Defendants refrained from filing their motion to dismiss and counterclaims against the Plaintiffs. Further, Camelot successfully settled the Utah Litigation on behalf of themselves and Plaintiff Jarowey, giving him a tremendous benefit of the bargain reached on August 31. Plaintiffs cannot now, after having enjoyed the benefit of the Defendants' partial performance under the Settlement Agreement and Release, seek to reinstate this case.

Moreover, an award of attorneys' fees and costs to the Defendants is appropriate here because of the Plaintiffs' improper delay and refusal to finalize written documents consistent with the settlement. The Plaintiffs' purported reinstatement of the action is especially egregious in light of the incredibly valuable benefits given to Plaintiffs vis-à-vis the Utah Litigation, i.e., representation in that action by Camelot, a complete release, and the dismissal of that action with prejudice without any liability to Jarowey. *See Vari-O-Matic Machine Corp. v. N.Y. Sewing Machine Attachment Corp.*, 629 F. Supp. 257, 259 (S.D.N.Y. 1986) (granting motion to enforce settlement and awarding attorneys' fees due to non-movant's bad faith delay and related efforts to frustrate settlement). Indeed, the Court has inherent authority to award attorneys' fees against a party for seeking additional settlement terms after the other party partially performed the settlement or otherwise acting in bad faith. *Baker v. Health Mgmt. Sys., Inc.*, 264 F.3d 144, 149 (2d Cir. 2001); *see also Royal Indian Raj Int'l Corp. v. Domains by Proxy, Inc.*, No. 08 Civ. 3445(JGK), 2011 WL 2946367, *4 (S.D.N.Y. July 20, 2011) (granting motion to enforce settlement agreement and awarding attorneys' fees); *Thomas & Agnes Carvel Found. v. Carvel*, 736 F. Supp. 2d 730, 767 (S.D.N.Y. 2010) (awarding attorneys' fees for acting in bad faith and for an improper purpose); *Leonard v. Univ. of Del.*, 204 F. Supp. 2d 784, 788-89 (D. Del. 2002) (granting motion to enforce settlement agreement and awarding attorneys' fees because of non-movant's bad faith efforts to secure additional settlement terms after movant's partial performance).

There is no dispute that the Parties settled the case on August 31. The Plaintiffs' improper refusal to execute the 1/25/12 Settlement Papers, especially after receiving representation, indemnification, and a complete release in the Utah Litigation—which benefits were given to Mr. Jarowey solely as a result of the August 31 settlement in this case—should not

be permitted.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court:  (i) enforce the settlement agreement reached by the Parties on August 31, 2011, (ii) dismiss the Plaintiffs' Complaint with prejudice, and (iii) grant such other and further relief as this Court may deem just, equitable, and proper, including an award of the Defendants' attorneys' fees and costs, as well as the damages they have incurred, as a result of the Plaintiffs' failure to finalize the settlement papers.[3]


Dated: New York, New York
       March 23, 2012

                    SNR DENTON US LLP

                    By: _____
                    Jonathan E. Goldberg

                    1221 Avenue of the Americas
                    New York, New York 10020
                    Telephone:  212-768-6700

                    Attorneys for Defendants Camelot
                    Entertainment Group, Inc., Robert P. Atwell,
                    and Steven V. Istock

---

[3] As previously indicated, in the event that this motion is denied, the Defendants intend to file their motion to dismiss the Complaint for the reasons, among many others, set forth in their June 20, 2011 letter to the Court (attached to the Goldberg Decl. as Exh. 2).  The Defendants also intend to file counterclaims against the Plaintiffs seeking, among other things, punitive damages, attorneys' fees, and costs.