```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
PETER M. JAROWEY II, SOMERSET        : 11 Civ. 2611 (LAP) (JCF)
GROUP, LLC, JOHN B. HOLLISTER III,   :
and DOUGLAS Q. HOLMES,               :       REPORT AND
                                     :       RECOMMENDATION
                  Plaintiffs,        :
                                     :
         - against -                 :
                                     :
CAMELOT ENTERTAINMENT GROUP, INC.,   :
ROBERT P. ATWELL, and STEVEN V.      :
ISTOCK,                              :
                                     :
                  Defendants.        :
- - - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE LORETTA A. PRESKA, CHIEF JUDGE:

The defendants in this action seek an order enforcing the terms of a settlement agreement allegedly reached during an August 31, 2011 mediation held before me.  For the reasons that follow, I recommend that the defendants' motion be denied.

Background

The plaintiffs, consultants Peter M. Jarowey II, Somerset Group, LLC, John B. Hollister III, and Douglas Q. Holmes, filed this action against defendant Camelot Entertainment Group, Inc. ("Camelot") and its officers Robert P. Atwell and Steven V. Istock, alleging that the defendants had committed securities fraud, breach of fiduciary duty, corporate waste, and breach of contract. (Declaration of Jonathan E. Goldberg dated March 23, 2012 ("Goldberg Decl."), ¶ 4).  More specifically, the complaint alleges, among other things, that Camelot breached certain consulting agreements by failing to compensate the plaintiffs with Camelot shares for work performed under those agreements.

1

(Complaint, ¶ 29; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Enforce the Settlement Agreement ("Pl. Memo.") at 4-5).  At the time that the complaint in this action was filed, defendant Camelot and plaintiff Jarowey had both been named as defendants in litigation in the United States District Court for the District of Utah (the "Utah Litigation").  (Goldberg Decl., ¶ 4).

In August 2011, then-District Judge Robert J. Holwell referred the case to me to conduct a settlement conference, which I held on August 31, 2011.  (Goldberg Decl., ¶ 6; Declaration of Joseph D. Carney dated May 2, 2012 ("Carney Decl."), ¶ 3).  The parties agreed to certain terms at the conference, including that Camelot (1) would issue to Mr. Jarowey six $100,000 convertible notes bearing 5% accrued interest, each backed by a separate stipulated judgment and each with a 75-day cure period in the event of a default; and (2) would issue stock certificates reflecting that Mr. Hollister and Mr. Holmes each held $100,000 in preferred stock, one-third of which would be redeemable by Camelot into cash or common stock each year for a period of three years.  (Goldberg Decl., Exh. 3).  The parties subsequently "informed the Court that they ha[d] reached a settlement" (Order of Discontinuance dated Sept. 7, 2011 ("Order of Discontinuance"); Carney Decl., ¶ 4; Declaration of Jonathan E. Goldberg dated May 14, 2012 ("Goldberg Reply Decl."), ¶ 2), but retained the right to reinstate the action within 30 days "if in fact there has not been a settlement" (Order of Discontinuance).

Thereafter, on September 28, 2011, counsel for the defendants sent to counsel for the plaintiffs a draft settlement agreement. (Carney Decl., ¶ 5; Draft Settlement Agreement dated September 2011 ("1st Draft Settlement"), attached as Exh. 3 to Carney Decl.). Between October 5, 2011, and November 22, 2011, the parties requested and received three extensions of the deadline to reinstate the action. (Memorandum Endorsement dated Oct. 19, 2011; Memorandum Endorsement dated Nov. 1, 2011; Memorandum Endorsement dated Nov. 22, 2011).   On October 12, 2011, the Utah Litigation against Camelot and Mr. Jarowey settled. (Settlement Agreement and Release dated Oct. 12, 2011 ("Utah Settlement"), attached as Exh. 4 to Goldberg Decl.).   In early November 2011, plaintiffs' counsel sent defendants' counsel modified settlement papers. (Agreement of Settlement and General Release dated November 2011 ("2d Draft Settlement"), attached as Exh. C to Goldberg Reply Decl.).   In mid-December, defendants' counsel sent plaintiffs' counsel another draft settlement agreement, incorporating certain changes to their earlier draft. (Carney Decl., ¶ 7; Agreement of Settlement and General Release dated December 2011 ("3d Draft Settlement"), attached as Exh. 8 to Carney Decl.).   The parties thereafter requested and received three more extensions of the deadline to reinstate the action. (Memorandum Endorsement dated Dec. 21, 2011; Memorandum Endorsement dated Jan. 5, 2012; Memorandum Endorsement dated January 27, 2012).   On January 25, 2012, defendants' counsel sent plaintiffs' counsel a further revised agreement for "final[] review." (Goldberg Decl., ¶ 8; E-mail of Jonathan Evan Goldberg

3

dated Jan. 25, 2012 and attached Agreement of Settlement and General Release dated Jan. 27, 2012 ("4th Draft Settlement"), attached as Exh. 1A to Goldberg Decl.; Carney Decl., ¶ 18).

The plaintiffs refused to sign the 4th Draft Settlement, and subsequently requested that the Court reinstate the action. (Goldberg Decl., ¶ 12 & Exh. 7; Carney Decl., ¶ 19 & Exh. 16). This motion was filed on March 23, 2012.[1]

Discussion

A.   Governing Law

It is well-settled in the Second Circuit that "[p]arties can enter into binding oral agreements." Figueroa v. City of New York, No. 05 Civ. 9594, 2011 WL 309061, at *3 (S.D.N.Y. Feb. 1, 2011) (citing Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985)), aff'd sub nom. Figueroa v. New York City Department of Sanitation, __ F. App'x __, 2012 WL 1216507 (2d Cir. 2012). This principle has been held to apply equally to settlement agreements. See id. ("Where the parties intend to be bound, an oral settlement of a litigation is binding even if a party later changes his or her mind." (citing Powell v. Omnicom, 497 F.3d 124, 129-30 (2d Cir. 2007)); Foster v. City of New York, No. 96 Civ. 9271, 2000 WL 145927, at *4 (S.D.N.Y. Feb. 7, 2000) ("This court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart.").

---

[1] Judge Holwell retired in the early part of 2012. On April 25, 2012, this case was reassigned to the Honorable Loretta A. Preska, Chief Judge, who subsequently referred the instant motion to me.

The plaintiffs, however, assert that under New York Civil Practice Law and Rules ("CPLR") § 2104, a settlement agreement is enforceable only if it is either "memorialized in a signed writing or formal order, or [] made in 'open court.'" (Pl. Memo. at 14). If this is correct, then any oral agreement reached at the settlement conference cannot be binding.

Section 2104 provides:

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.  With respect to stipulations of settlement and notwithstanding the form of the stipulation of settlement, the terms of such stipulation shall be filed by the defendant with the county clerk.

CPLR § 2104.  It is an open question whether this statute applies in federal court.  See Figueroa, 2012 WL 1216507, at *1 ("[W]e note that the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one." (citing Ciaramella v. Reader's Digest Association, 131 F.3d 320, 322 n.1 (2d Cir. 1997), and Massie v. Metropolitan Museum of Art, 651 F. Supp. 2d 88, 92 (S.D.N.Y. 2009)).  The Second Circuit has repeatedly deferred ruling on the question, stating that it has no practical significance because "New York law and federal common law are materially indistinguishable."  Powell, 497 F.3d at 129 n.1.

On one hand, some district courts have indicated that the answer depends on whether the underlying case lies within the federal court's diversity jurisdiction or its federal question

jurisdiction.  For example, in Figueroa, the court held that, in federal question cases (like this one), federal common law determines whether an oral settlement agreement is enforceable, and therefore Section 2104 is irrelevant.  See 2011 WL 309061, at *5.

On the other hand, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law." Omega Engineering, Inc. v. Omega S.A., 432 F.3d 437, 443 (2d Cir. 2005).  A conventional contract claim in federal court will generally be governed by state substantive law, whether jurisdiction is founded on diversity or on the court's supplemental jurisdiction in a federal question case.  See, e.g., North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2d Cir. 1999) (applying state law to a claim over which the court exercised supplemental jurisdiction).  Thus, in this case, because the defendants allege that this settlement agreement was made in New York (Def. Memo. at 2), its enforceability would be governed by New York substantive law.[2]  See North Atlantic Instruments, 188 F.3d at 43.

However, that alone does not answer the question of whether Section 2104 applies.  Rather, pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and its progeny, the solution to that problem turns on whether the statute codifies a rule of substantive or procedural law.  See, e.g., Gasperini v. Center for Humanities,

---

[2]  The 4th Draft Settlement includes a provision expressly choosing New York law for questions of validity, interpretation, or performance.  (4th Draft Settlement, § 26).  However, no party asserts that the parties agreed on this provision in the August 31, 2011 settlement conference, so it is irrelevant here.

Inc., 518 U.S. 415, 426-27 (1996); Gravatt v. City of New York, 54 F. Supp. 2d 233, 233-34 (S.D.N.Y. 1999). Courts in this district have not reached a consensus on this issue, either. Compare Rosenberg v. Inner City Broadcasting Corp., No. 99 Civ. 9579, 2001 WL 995349, at *2 (S.D.N.Y. Aug. 30, 2001) (applying Section 2104 as substantive New York contract law), with Mone v. Park East Sports Medicine and Rehabilitation, P.C., No. 99 Civ. 4990, 2001 WL 1518263, at *4 (S.D.N.Y. Nov. 29, 2001) (disagreeing expressly with Rosenberg and stating, "Rule 2104 is a purely procedural rule").

Those cases that hold Section 2104 is a procedural rule have the better argument. First, by its terms, it governs conduct in court proceedings. That is, it provides rules for "agreement[s] . . . relating to any matter in an action," requiring some to be in writing and allowing others to be made on the record in open court, and, further, dictates the repository for the filing of certain settlement documents. See CPLR § 2104 (emphasis added). Notwithstanding the fact that these requirements relate to the enforceability of certain agreements, they do not seem to me to implicate the "'the twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'" Gasperini, 518 U.S. at 428 (quoting Hanna v. Plumer, 380 U.S. 460, 468 (1965)). In other words, application of the rule would not "have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court." Gasperini, 518

U.S. at 428 (internal quotation marks and brackets omitted).  It is highly unlikely, for example, that a litigant would choose a federal forum in order to take advantage of a rule that a settlement agreement -- or any other stipulation -- could be entered into orally.  Nor can I imagine how enforcing such an oral agreement would unfairly discriminate against citizens of New York. Finally, there is a practical consideration that counsels against applying Section 2104 in federal court.  New York's high court has held that Section 2104 must be strictly construed.  <u>See</u> <u>Langreich v. Gruenbaum</u>, 775 F. Supp. 2d 630, 637 (S.D.N.Y. 2011); <u>Bonnette v. Long Island College Hospital</u>, 3 N.Y.3d 281, 285-86, 785 N.Y.S.2d 740-41 (2004).  It would indeed be odd to hold as a matter of substantive law that, in order to be effective in a federal action, the terms of a stipulation of settlement must be filed with an officer of New York State, which is one of the statute's requirements.  <u>See</u> CPLR § 2104 (requiring terms of stipulations of settlement to be filed with county clerk); <u>County Town of North Hempstead v. County of Nassau</u>, 32 Misc. 3d 809, 811, 929 N.Y.S.2d 833, 835 (N.Y. Sup. Ct. 2011) (noting that, pursuant to N.Y. County Law § 3 and N.Y. Gen. Mun. Law § 100, a county is a political subdivision of the State).

However, I do not need to resolve this question because the outcome in this case is the same whether or not Section 2104 governs.[3]

_____

[3] This does not mean that Section 2104 is completely irrelevant here.  To the extent that it indicates a preference for written, signed settlement agreements, it figures into the analysis

B.   <u>Enforcement of an Oral Settlement Agreement</u>

The burden of demonstrating that an oral settlement agreement is binding lies with the party seeking enforcement. "'A party seeking to enforce a purported settlement agreement has the burden of . . . demonstrat[ing] that the parties actually entered into such an agreement.'" <u>Min v. Target Stores</u>, 553 F. Supp. 2d 218, 221 (E.D.N.Y. 2008) (alterations in original) (quoting <u>Benicorp Insurance Co. v. National Medical Health Card Systems, Inc.</u>, 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006)).   The ultimate question is whether the parties intended to be bound by an agreement in the absence of a writing.   <u>See Ciaramella v. Reader's Digest Association</u>, 131 F.3d 320, 322 (2d Cir. 1997) ("[I]f the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then."). In <u>Winston v. Mediafare Entertainment Corp.</u>, 777 F.2d 78 (2d Cir. 1985), the Second Circuit laid out several factors to be addressed in determining this question:

> The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

<u>Id.</u> at 80; <u>accord Powell v. Omnicom, BBDO/PHD</u>, 497 F.3d 124, 129 (2d Cir.2007); <u>Abel v. Town Sports International Holdings, Inc.</u>, No. 09 Civ. 10388, 2010 WL 5347055, at *4 (S.D.N.Y. Dec. 23, 2010).

---

of the parties' intent to be bound in the absence of a writing, which is discussed below. <u>See Clark v. Gotham Lasik, PLLC</u>, No. 11 Civ. 1307, 2012 WL 987476, at *5 (S.D.N.Y. March 2, 2012).

"No single factor is dispositive; rather, all four factors should be considered for their bearing on the parties' intent in the context of the entire case." Langreich, 775 F. Supp. 2d at 636; see also Ciaramella, 131 F.3d at 323.  Therefore, I will address each factor, although in a slightly different order.

### 1.   Reservation of Right Not to be Bound

The first Winston factor focuses on whether either party reserved the right not to be bound prior to a writing.  Courts have recognized that a reservation of this right is entitled to great weight.  See Kaczmarcysk v. Dutton, 414 F. App'x 354, 355 (2d Cir. 2011) (noting that although no single Winston factor is dispositive, "where 'there is a writing between the parties showing that [one party] did not intend to be bound . . . a court 'need look no further than the first factor.'" (alterations in original) (quoting RKG Holdings, Inc. v. Simon, 182 F.3d 901, 901 (2d Cir. 1999)); Nieves v. Community Choice Health Plan of Westchester, Inc., No. 08 Civ. 0321, 2011 WL 5533328, at *4 (S.D.N.Y. Aug. 31, 2011).

> Although this factor is phrased in terms of 'express'
> reservations, courts -- including the court in Winston
> -- also analyze whether the particular facts and
> circumstances of the case -- such as the nature of the
> negotiations or the language of any draft agreements --
> demonstrate an implied reservation of the right not to be
> bound until the execution of a written agreement.

Lindner v. American Express Corp., No. 06 Civ. 3834, 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007).

Here, there is no indication that either of the parties expressly reserved the right not to be bound at the August 31, 2012

conference.   Neither   the   notes   purportedly   taken   during   the conference by defendants' counsel (Goldberg Decl., Exh. 3 at 1) nor my contemporaneous notes mark any such reservation.

However, there is ample evidence in the record that such a reservation was implied.  First, each iteration of the proposed agreement expressly states that it is not effective until "a copy or copies of this Settlement Agreement executed by the Parties in the names as those names appear at the end of this Settlement Agreement" is received either by Camelot (1st Draft Settlement, § 20) or by "any party" (2d Draft Settlement, § 29; 3d Draft Settlement, § 26; 4th Draft Settlement, § 27).  Thus, the draft agreements provide that execution of the written agreement was a necessary prerequisite to enforceability of the settlement.  See Kaczmarcysk, 414 F. App'x at 355 (finding that provision that agreement is effective when fully executed indicates reservation not to be bound); Ciaramella, 131 F.3d at 324 (same); Nieves, 2011 WL 5533328, at *5 (stating that references in written agreement to its "execution" militate in favor of finding reservation of right to be bound).

In addition, each of the draft agreements includes a merger clause stating that it is the "final" and "exclusive" statement of the agreement, "supersed[ing] all prior or contemporaneous agreements." (1st Draft Settlement, § 13; 2d Draft Settlement, § 22; 3d Draft Settlement, § 19; 4th Draft Settlement, § 20).  "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a

11

written agreement." Ciaramella, 131 F.3d at 324; see also Nieves, 2011 WL 5533328, at *4 (quoting Ciaramella); Lindner, 2007 WL 1623119, at *7 (same).

Finally, each draft agreement provides that by "executing" the agreement, each party represents that it has received the necessary advice of counsel and "consents to the rights, conditions, duties and responsibilities imposed" by the agreement. (1st Draft Settlement, § 21; 2d Draft Settlement, § 30; 3d Draft Settlement, § 27; 4th Draft Settlement, § 28). Thus, the "signature[s] w[ere] meant to signify [] voluntary and informed consent to the terms and obligations of the agreement. By not signing, [the plaintiffs] demonstrated that [they] withheld such consent." Ciaramella, 131 F.3d at 325.

It is true that the parties informed both Judge Holwell and me that they had reached a settlement. However, there is no evidence that this statement represented an intent to be bound immediately in the absence of a writing. See id. ("[N]othing in the record suggests that either attorney took th[e] statement [that the parties 'ha[d] a deal'] to be an explicit waiver of the signature requirement.").

The parties' written expressions during the entire drafting period from October 2011 to January 2012 include numerous indications that any settlement agreement would be binding only upon its execution by all parties. Therefore, the first Winston

factor weighs heavily against granting the defendants' motion.[4]

    2.  <u>Type of Contract Committed to Writing</u>

    It was eminently reasonable for the plaintiffs to believe that the settlement agreement would become binding only when written and signed, as an agreement as complex as this one would normally be in writing.  The purported agreement mandates issuance of six separate $100,000 notes, each maturing 12 months successively, supported by six separate escrowed judgments, and requires cooperation among the parties to sell those notes.  This is an obligation that stretches years into the future.  In addition, the settlement requires Camelot to adopt an amended certificate of designation of the Series G preferred shares issued to Mr. Holmes and Mr. Hollister reflecting that each of those defendants own $100,000 in shares, and register that certificate with the state of Delaware.  If those corrected shares were not converted into common stock or sold, Holmes and Hollister would be entitled to have them redeemed by Camelot, and that redemption right could exist for as long as three years.  These provisions are sufficiently elaborate, and the amount of money is sufficiently great, that it would be reasonable to expect that the agreement reciting them would be reduced to writing.  <u>See, e.g.</u>, <u>Langreich</u>, 775 F. Supp. 2d at 638 ("The agreement involved only a handful of provisions, but they contemplated some fairly substantial financial transactions,

_____

    [4] Indeed, "[t]his finding is alone sufficient to deny the [] motion." <u>Nieves</u>, 2011 WL 5533328, at *6 (citing <u>Kaczmarcysk</u>, 414 F. App'x at 355).  As discussed below, other <u>Winston</u> factors only strengthen this conclusion here.

including the issuance of shares and registration with the SEC, and in consequence partook of the sort of agreement that parties normally insist be reduced to writing . . . .").

Moreover, CPLR § 2104 indicates a preference for committing settlement agreements to writing in order to stanch a potential "endless stream of collateral litigation over [] settlement terms" and foster "the policy concerns of certainty, judicial economy, flexibility to conduct settlement negotiations without fear of being bound by preliminary offers[,] and the prevention of fraud." Bonnette, 3 N.Y. 2d at 208-09, 785 N.Y.S.2d at 740-41.  Thus, this Winston factor, like the first, counsels against enforcement of a settlement.

### 3.   Partial Performance

"[P]artial performance is an unmistakable signal that one party believes that there is a contract; and the party who accepts the performance signals, by that act, that it also understands a contract to be in effect."  R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75-76 (2d Cir. 1984).

The defendants assert that Camelot partially performed the agreement by "t[aking] over Jarowey's defense and . . . settl[ing] the [Utah Litigation] on his behalf without requiring him to contribute anything towards the settlement." (Def. Memo. at 10). They cite as evidence the fact that the final iteration of the settlement agreement includes recitals that (1) the agreement reached on August 31, 2011, required "representation by Camelot of Jarowey in the Utah Litigation" and (2) "the Utah Litigation was

14

recently settled and dismissed with prejudice." (Def. Memo. at 10; 4th Draft Settlement at 3). They further point to the fact that, under the Utah Settlement, Mr. Atwell, an officer of Camelot, was to accept any required notice on behalf of the individual defendants, including Mr. Jarowey, and that Camelot is the only one of the defendants in that action that was required to provide any consideration for the agreement. (Def. Memo. at 10; Utah Settlement at 4, 25; Reply Memorandum of Law in Further Support of Defendants' Motion to Enforce the Settlement Agreement ("Def. Reply") at 4).

Mr. Jarowey contends that there was no partial performance, stating that he was represented by his own counsel in the Utah Litigation and that Camelot has not reimbursed or indemnified him for his expenses in that matter. (Declaration of Peter M. Jarowey II dated May 2, 2012, ¶ 23).

The defendants have the burden here, and their evidence is unconvincing, at best. While the 4th Draft Settlement asserts that the parties had agreed that Camelot would represent Mr. Jarowey in the Utah Litigation and that the Utah Litigation had settled, it stops short of stating that Camelot did, in fact, represent Mr. Jarowey in that litigation. Similarly, the Utah Settlement does not include a single provision that clearly demonstrates that Camelot defended, indemnified, or represented Mr. Jarowey. Most importantly, the order dismissing the Utah Litigation belies this representation. David J. Shapiro (also Mr. Jarowey's counsel in this litigation) signed that document as attorney for Mr. Jarowey,

while Jonathan Levitan and John Snow signed as attorneys for Camelot and other parties. (Order Granting Dismissal with Prejudice, Incentive Capital, LLC v. Camelot Entertainment Group, No. 2:11-CV-00288 (filed Dec. 1, 2011) ("Utah Dismissal")). This clearly indicates that Mr. Jarowey was represented by his own counsel rather than by counsel for Camelot in the Utah Litigation.

Other evidence also undermines the defendants' assertion. First, although the Utah Settlement was signed on November 16, 2011, and the Utah Litigation dismissed on December 1, 2011 (Utah Dismissal), both parties continued to include the provision requiring Camelot to defend, indemnify, and represent Mr. Jarowey in the Utah Litigation in drafts that post-dated one or both of these events. (2d Draft Settlement, § 9; 3d Draft Settlement, § 6). This at least raises the possibility that any potential obligation running from the defendants to Mr. Jarowey had not been satisfied. Moreover, the first three drafts of the settlement agreement require Mr. Jarowey and counsel for Camelot to execute a "non-fee retainer agreement and appropriate conflict waiver" before the representation commenced. (1st Draft Settlement, § 2; 2d Draft Settlement, § 9; 3d Draft Settlement, § 6). However, the defendants did not provide this document to the Court in support of their motion, notwithstanding the fact that such an agreement would almost certainly be required by ethical rules if Camelot's counsel were to represent Mr. Jarowey. See, e.g., N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0, Rule 1.7 (requiring written informed consent from both parties before attorney may simultaneously

represent clients with conflicting interests).

Contrary to the defendants' insistence that their evidence "clearly show[s] that Camelot and its counsel represented [] Jarowey and settled the [Utah Litigation] on [his] behalf" (Def. Reply at 4), they have not demonstrated that they partially performed under the proposed agreement.   This factor therefore weighs against enforcing a putative settlement among the parties.

### 3.   Terms Remaining for Negotiation

Winston asked "whether there was literally nothing left to negotiate" after the parties' oral agreement. Winston, 777 F.2d at 82 (internal quotation marks omitted).   This is not, perhaps, to be taken literally, since later cases have asked, instead, only whether the parties had agreed on all material terms. See Powell v. Omnicom, 497 F.3d 124, 130 (2d Cir. 2007); Ciaramella, 131 F.3d at 325; Langreich, 775 F. Supp. 2d at 637.   Those cases have still recognized, however, that "even 'minor' or 'technical' changes arising from negotiations over the written language" can suffice to "show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to both sides in every respect." Powell, 497 F.3d at 130 (internal quotation marks omitted).

The defendants argue that all six material terms were agreed upon at the settlement conference:

> (1) Camelot will issue six notes to [] Jarowey for $100K each, dated as of 12 months ago in 2010 and maturity dates of 12 months successively, 5% interest accrued on the outstanding balance;

17

(2) Each note to be backed by a separate judgment that will be held in escrow in the event of a default, with a 75 day grace period;

(3) The [p]arties will work together to sell the Jarowey notes to third parties who purchase debt;

(4) Camelot to provide indemnification of [] Jarowey in the Utah [Litigation] and representation of him by Jonathan Levitan;

(5) Camelot to correct the Series G preferred shares previously issued to [] Holmes and [] Hollister so that they will have $100K each in shares (they can look to [Camelot] for redemption of 1/3 of the amount each year for 3 years if third party does not purchase from them); and

(6) The [p]laintiffs to provide the [d]efendants with complete releases in [this] . . . litigation and the Utah Litigation.

(Def. Memo. at 5-6; Goldberg Decl., Exh. 3 at 2).

The plaintiffs counter that only "a few of the [critical] terms" were defined during the settlement conference. (Pl. Memo. at 21). However, their brief does not identify the "critical provisions" that remained to be negotiated, instead attaching redlined copies of the document comparing the 1st Draft Settlement to the 3d Draft Settlement) and the 3d Draft Settlement to the 4th Draft Settlement, as well as a list of all changes between each pairing. (Carney Decl., Exhs. 9, 15). It appears from these documents that there were significant changes in the draft agreements between September 2011 and January 2012. For example, the 3d Draft Settlement included provisions not found in the 1st Draft Agreement that allowed Mr. Jarowey's notes to be transferred; required Camelot to seek buyers for those notes; and outlined the mechanics for conversion of those notes into shares. (Carney

18

Decl., Exh. 9 at 1, 10).  Similarly, the 3d Draft Settlement made
the redemption right of the Series G shares transferable.  (Carney
Decl., Exh. 9 at 1, 13-14).  The 4th Draft Settlement requires Mr.
Holmes and Mr. Hollister to convert the Series G shares or attempt
to sell them (with Camelot's assistance) before redemption.
(Carney Decl., Exh. 15 at 1, 10-11).  That draft also relieves
Camelot of the obligation to pay 5% interest on the Series G shares
and adds a procedure for the release of the six stipulated
judgments from escrow.  (Carney Decl., Exh. 15 at 1, 11, 25).
These are modifications of some importance, affecting both
procedure under the agreement and the value of the consideration.

    The defendants assert that any changes are the result of their
"willingness to compromise" or "the need to correct the earlier
drafts to conform the papers to the parties' agreement."  (Def.
Reply at 8; Goldberg Reply Decl., ¶ 4).  This is a conclusory
statement that, at the very least, indicates that the plaintiffs
believed that issues remained to be decided after the August 31,
2011, settlement conference.  The defendants also insist that the
1st and 3d Draft Settlements are "not relevant as to whether the
documents sent in January 2012 accurately reflect the parties'
settlement agreement."  (Def. Reply at 8).  Certainly, however,
material changes between the first drafts of the agreement and the
final draft sent in January 2012 show that negotiations about the
terms of the settlement continued for months.

    In any case, even if this factor weighed in favor of enforcing
the terms that emerged from the settlement conference, it would not

be sufficient to tip the scales.  The other three factors, most particularly the reservation of the right not to be bound without a writing, demonstrate that the parties contemplated that any agreement would be enforceable only after reduced to writing and signed.[5]

Conclusion

For these reasons, I recommend that the defendants' Motion to Enforce the Settlement Agreement (Docket no. 23) be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Loretta A. Preska, Room 2220, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

---

[5] The plaintiffs' extensive discussion of a contract that Camelot entered into with a company called JSJ Investments, Inc. ("JSJ") (Pl. Memo. at 7-9, 22-23) is irrelevant to the question presented here.  The question to be answered is whether there was assent to the terms of an agreement on August 31, 2011.  The fact that a subsequent contract "eviscerated a key component" of the prior settlement (Pl. Memo. at 7) is not relevant to whether an agreement was reached, but, rather, to whether the performance under the agreement was satisfactory.  See Powell, 497 F.3d at 130 (noting that issues arising after agreement on terms of settlement are "relevant to the performance of the settlement rather than assent to its terms.").  Indeed, the plaintiffs seem to realize this, as they have threatened to sue for breach of contract if the purported settlement were to be enforced.  (Pl. Memo. at 23). Therefore, I have not discussed the JSJ agreement here.

20

Respectfully Submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE.

Dated: New York, New York
        September 10, 2012

Copies mailed this date:

David J. Shapiro, Esq.
Marc E. Kasowitz, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1501 Broadway, 12th Floor
New York, New York  10036

Joseph Devon Carney, Esq.
Joseph D. Carney & Associates, L.L.C.
2001 Crocker Road, Suite 530
Westlake, Ohio 44145

Jonathan E. Goldberg, Esq.
SNR Denton US LLP
1221 Avenue of the Americas
New York, New York  10020

21